[No. S004699. Crim. No. 24863. Apr. 29, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYNARD PAUL CUMMINGS and KENNETH EARL GAY, Defend-
ants and Appellants.

1244

1252

**COUNSEL**

Robert Weisberg and Richard Urdan, under appointments by the Supreme Court, and Martin H. Dodd for Defendants and Appellants.

Daniel E. Lungren, Attorney General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Edward T. Fogel, Jr., Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Robert F. Katz, Donald E. de Nicola, Susan Lee Frierson and William T. Harter, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.—**

I.

After a joint trial before separate juries in the Los Angeles County Superior Court, defendants Raynard Paul Cummings and Kenneth Earl Gay were convicted of the June 2, 1983, wilful, deliberate, and premeditated first degree murder of Paul Verna. (Pen. Code, § 189; count XIX.)[1] The juries also found that the murder was committed under the special circumstances of an intentional killing of a peace officer engaged in the performance of his duties by one who knew or should have known he was such (§ 190.2, subd. (a)(7)), and was committed for the purpose of preventing a lawful arrest (§ 190.2, subd. (a)(5)); that a principal was armed with a firearm (§ 12022, subd. (a)); and that each defendant personally used a firearm (§§ 12022.5, subd. (a), 1203.06, subd. (a)(1)). Each jury returned a penalty verdict of death.

Raynard Paul Cummings had previously entered pleas of guilty to two counts (I, VII) of attempted robbery (§§ 664/211), eleven counts (II, III, IV, V, VI, VIII, IX, XII, XIII, XIV, XV) of robbery (§ 211) and one count (XVI) of conspiracy to commit robbery (§§ 182/211), in each of which he and Kenneth Earl Gay were jointly charged. He had also entered pleas of guilty

---

[1] All statutory references are to the Penal Code unless otherwise noted.

to two additional robbery counts (X, XI) and to one count (XVIII) of being an ex-felon in possession of a concealable firearm (§ 12021).[2]

The jury before whom Kenneth Earl Gay was tried jointly with Raynard Paul Cummings on the murder charge had first heard evidence on counts charging Gay with, and ultimately convicted him of, the two attempted robbery counts, ten of the robbery counts (counts II, III, IV, V, VI, VIII, IX, XII, XIII, XIV), conspiracy to commit robbery (count XVI), and being an ex-felon in possession of a concealable weapon (count XVII), and found that he had personally used a firearm in committing three of those offenses (§§ 12022.5, 1203.06, subd. (a); counts II, VI, IX) and had inflicted great bodily injury on victims in two (counts II, VI).[3]

After denying motions for new trial and modification of the penalty, the trial court imposed a sentence of death on each defendant for the murder. These appeals are automatic. (§ 1239, subd. (b).)

Each defendant claims that he was denied trial before a jury selected from a representative cross-section of the populace; that the trial court erroneously

---

[2]Sentence was imposed on defendant Cummings on the noncapital counts as follows:

A term of five years was imposed as the base term on count XII with a two-year enhancement for use of a firearm, to run consecutively to the term imposed on count XIX. Sentence was stayed on counts I, IV, and X. Sentence on the remaining counts was: count II—one year consecutive to count XII; count III—one year with an eight-month enhancement for use of a firearm; count V—one year with an eight-month enhancement for use of a firearm; count VI—one year with a four-month enhancement for being armed; count VII, eight months with a four-month enhancement for being armed; count VIII—one year with a four-month enhancement for being armed; count IX—one year; count XI—one year with an eight-month enhancement for use of a firearm; count XIII—one year with a stayed sentence for use of a firearm; count XIV—one year with a stayed sentence for use of a firearm; count XV—one year with an eight-month enhancement for use of a firearm; count XVIII—eight months; count XVI—one year. A five-year term was imposed for a prior serious felony conviction.

The remaining terms for being armed were stayed. All nonstayed terms were ordered to be consecutive to the term imposed on count XII.

[3]Gay was acquitted by the trial court of an 11th robbery count. (Count XV.) Sentence was imposed on defendant Gay on noncapital charges as follows:

A term of five years was imposed as the base term for count II, with a two-year enhancement for use of a firearm and a three-year enhancement for infliction of great bodily injury. This term was ordered to run consecutively to the sentence imposed on count XIX. Sentence was stayed on counts I, II, and IV. Sentence on the remaining counts was: count VI—a one-year term with an eight-month enhancement; count VII—an eight-month term with an eight-month enhancement for use of a firearm and a one-year enhancement for infliction of great bodily injury; count VIII—one year; count IX—one year with an eight-month enhancement for use of a firearm; count XII—one year with a four-month enhancement for being armed; count XIII—one year; count XIV—one year; count XVI—one year; and count XVII—eight months. An additional five-year term was imposed for the prior serious felony convictions.

Terms on all of the remaining armed findings were stayed. All nonstayed terms were ordered to be consecutive to the term imposed on count II.

excused for cause prospective jurors whose views on the death penalty did not affect their ability to fairly apply the law; and that the court erred in denying their motions for severance and instead required them to stand trial together before separate juries on the murder count and, as to Gay, on the robbery counts. They also argue that their motions for change of venue were erroneously denied.

Each also makes several individual claims of error. We conclude that the robbery, attempted robbery, and conspiracy to commit robbery convictions of defendant Gay must be reversed, but the judgments should be affirmed in all other respects.

II.

GUILT PHASE

THE PROSECUTION CASE

A description of the procedures utilized in the trial court and an overview of the evidence offered at the guilt phase of the joint murder trial is helpful in understanding the procedural and substantive issues. The evidence will be discussed in greater detail as it is relevant to the specific claims of error.

The robberies and related offenses in which defendants were implicated were committed in April and May 1983. All were committed in northern Los Angeles County.[4] Those charged in counts XII, XIII, and XIV allegedly occurred on May 29, 1983. That charged in count XV, of which only defendant Cummings was convicted, was allegedly committed on May 31, 1983, only two days before the murder. The time frame within which they were committed is relevant inasmuch as the People theorized that fear of arrest for the robberies was a motive for the murder.

The murder was committed about 5:40 p.m. on June 2, 1983, in the 12000 block of Hoyt Street in the Lakeview Terrace district of San Fernando Valley, a location within the City of Los Angeles. The victim, Los Angeles Police Department Motorcycle Officer Paul Verna, had stopped a stolen car being driven by Pamela Cummings (Pamela) for a traffic violation. The car stopped in front of 12124 Hoyt. Pamela's husband Raynard (Cummings) was in the rear seat of the two-door coupe. Kenneth Gay (Gay) was in the front passenger seat. The car, a gray or silver and black two-door 1979 Oldsmobile Cutlass coupe, had been stolen by Cummings and a second person who

[4]The robberies took place in Granada Hills on April 25, 1983 (counts I, II, and III); Studio City on May 6, 1983 (counts IV and V); Reseda on May 13, 1983 (count VI); Chatsworth on May 20, 1983 (count VII); Ventura Boulevard on May 21, 1983 (counts VIII and IX); North Hollywood on May 26, 1983 (counts X and XI); Sylmar on May 29, 1983 (counts XII, XIII, and XIV); and on May 31, 1983, a few blocks from the Lakeview Terrace location at which the murder was subsequently committed (count XV—defendant Cummings only).

entered the North Hollywood home of the sixty-nine-year-old owner and took the keys from her at gunpoint on May 26, 1983. Pamela had removed the license plates on the car prior to the time it was stopped by Officer Verna, replacing them with plates stolen from another car..

Pamela, who had no driver's license, stepped out of the car and offered other identification to the officer. He then approached the car and asked the occupants for identification. Officer Verna was then shot six times by the occupants of the car, all shots coming from a single handgun. The first shot knocked him backward and he fell. The coroner later labelled that first shot "Number 6." The remaining shots hit him as he was falling and lay on the street. The car then drove off, but quickly returned and stopped by the fallen officer. Gay stepped out, picked up Pamela's identification card, and the murder weapon which had been dropped or thrown down at the scene. The officer's gun was also picked up, either at this time or earlier when he fell.

The field identification card which Officer Verna had completed when he questioned Pamela was found at the scene. The entries on that card, although inaccurate as Pamela had given a false address, gave investigating police officers information that led to the apartment complex in which Kenneth and Robin Gay (Robin) lived. The officers followed Pamela and Robin from that location to a bus depot, and to Oceanside where the women left the bus and were picked up by Cummings and Gay in Robin's green Plymouth automobile. The foursome were arrested on June 3, 1983, after they had stopped at a convenience store in Escondido where Pamela had asked the proprietor for directions to Arizona and then had driven on to San Diego and headed east on a main route toward that state.

The officers were not aware while following the car that Cummings and Gay were in it. Only after they learned that the women planned to go to Arizona and stopped the car did they find the two men, Gay lying on the floor behind the front seat of the car and Cummings on the back seat. Officer Verna's gun was found on the floor under Gay.

At almost the same time, the Oldsmobile Cutlass was located where it had been abandoned. The license plates had been changed. Fingerprints of Cummings, Gay, and Pamela were identified in that car.

The murder weapon was not located. A comparison of bullets fired from a gun possessed by Cummings prior to the murder with those which killed Officer Verna confirmed that the same gun was used to commit the murder.

In the days immediately before the murder Cummings had told a companion twice that he was not worried about being stopped by police while in a stolen car because he would not give the officer a chance to ask him any questions. Both Gay and Pamela were present on one occasion when Cummings made this statement.

At the time of the murder Cummings was on parole by the State of Delaware. Gay was on parole following a felony conviction in California.

Several eyewitnesses observed some of the events on Hoyt Street. Their versions of the events and identification of the shooter or shooters varied greatly. The People relied on the statements of these witnesses and of others who related inculpatory statements subsequently made by Cummings for a theory that Cummings fired the first shot from the rear seat after which the gun was passed to Gay who stepped out of the car and fired the remaining shots into the fallen body of Officer Verna. Each defendant relied on some of the same evidence, as well as forensic evidence, in his effort to persuade the jury that the other fired all of the shots.

The eight independent eyewitnesses testified variously:

1. OSCAR MARTIN, who was 12 years old in 1983, identified Cummings as a person who shot Officer Verna. His trial and preliminary hearing testimony, and his statements to investigating officers, differed in significant respects.

At the trial Oscar testified that he was in the front yard of his home when he saw Officer Verna giving Pamela a ticket. A four-door gray car was stopped in front of the house. Oscar testified at one point that the driver's side was farthest from his house, but later said the driver was not on the far side.[5] The officer's motorcycle was behind the car.

Oscar went into his house and told his mother, who was in the kitchen, what he had seen. She told him to stay inside. He then looked out of the living room window. He saw the back door of the car open and a person he identified as Cummings get up and shoot the officer four times. Oscar first said that he thought that the door that opened was on the side of the car closest to his house, but he was not sure. He also thought that the officer was standing on the passenger side of the car. After the shooting he saw the man get into the car and drive off. He did not see anyone else in the car. On cross-examination Oscar testified that the car was between him and the officer and the person who shot the officer. He also testified that the shooting was over at the time his mother, Rosa Maria Martin, and his sister, Sabrina Martin, came to the front of the house from the kitchen, and that when he saw her coming he ran and told them that the officer had been shot four times.

---

[5]Apart from the inconsistencies in Oscar's testimony it was undisputed that the driver's side of the car driven by Pamela was the side farthest from Oscar. It was also undisputed, except for his testimony, that the car had only two doors. Shown a photograph of the car used by the defendants, Oscar testified that it was not the car he had seen because the car in the photograph had only two doors.

Among the witnesses who heard the shots, Oscar was the only one who heard only a single group of four shots.

At the preliminary hearing Oscar had testified that the door on the driver's side of the car was open and that he saw a man stand up and shoot the officer. That inconsistent testimony was admitted at trial. At the grand jury hearing Oscar testified that the man who shot the officer got out of the passenger side door. Oscar did not see any shots fired from within the car.

Earlier, at a lineup, Oscar had entered the number 4 on a card, thereby identifying Gay as the person who shot the officer. At trial he said he had marked down that number because he was copying from his mother's form, not because he recognized the person in the lineup. Oscar acknowledged that after viewing the lineup he told a detective that he first thought the person who was number 4 was the person who shot the policeman, but he had changed his mind because there were scratches on the face of the person in the lineup and he did not remember the man who shot the officer having scratches on his face. Following this explanation, defendant Gay was asked to stand and remove his eyeglasses. Oscar then agreed that Gay looked like the person wearing number 4 in a photograph of the lineup. He also conceded that he had not recognized anyone in a different lineup, and that the man wearing number 5 in a photo of that lineup was defendant Cummings. He had, however, identified another person in yet another lineup.

In an interview on the night of the murder Oscar had said that Officer Verna was knocked off balance while talking to Pamela when someone in the back seat of the car opened the door. The man in the back seat, a Black male in his 20's, skinny, with a moustache, sideburns and curly hair, then got out, took the officer's gun, and shot the officer 4 times. At the preliminary hearing Oscar had pointed to Gay as a person who had hair like the person he saw shoot Officer Verna.

2. ROSA MARIA MARTIN, Oscar's mother, had gone out and looked down her driveway after Oscar told her that a police officer was giving someone a ticket. She saw nothing, and went back inside. She then heard the gunshots, at least four, with a space between the first one and the others. Oscar then came to her and said: "They killed him."

After telling the others in the house to stay out of the living room, Rosa Martin looked out of the living room window. She saw the two-door car driving slowly down the street, saw the driver, whom she identified as Gay, get out and pick up a revolver, and get back into the car. A woman was then in the passenger seat, but Ms. Martin could not tell if anyone was in the rear seat. The man she saw was light skinned, with curly hair and a moustache. Oscar told her that the man he had seen was a Black man, "really dark." At the lineup she had identified number 4 (Gay), and had asked Oscar if number 4, whom Oscar had marked on his card, was the man he had seen. He replied "no" and then tried to erase the mark he had made but the pencil did not

have an eraser. Ms. Martin had instructed Oscar earlier to fill out the form in the same manner as she did, and he said he had put down the number 4 because she had done so.

Cummings offered evidence that Oscar was interviewed at the time of the lineup and said he thought number 4 was the shooter, but attempted to erase that number when he saw that the man had scratches on his face. He did not remember any scratches on the face of the man he saw shoot the policeman. He did not say that he had copied the number from anyone else.

3. SHEQUITA CHAMBERLAIN was a passenger in a car which drove by the intersection of Gladstone and Hoyt just after she heard a noise which she did not then recognize as a shot. She looked down Hoyt and saw a tall, dark-skinned Black man and a police officer. She thought they were talking. She saw a car stopped nearby and a police motorcycle. She then heard another shot, saw the officer fall on his back, and, after the car she was in turned and went back, she saw the man get into the car that was stopped next to the officer and drive off. Although Cummings's complexion, as depicted in a photograph, was close to that of the man she saw, Cummings was not that man. The complexion of Gay, as depicted in a photograph, was lighter than that of the man she saw.

4. MARSHA HOLT was in a bedroom of a home on Hoyt Street across the street from the scene of the homicide when she looked out and saw a silver car and a police officer giving a ticket to Pamela. She turned away, but looked out again when she heard gunshots. She first heard one shot and then after a minute or two heard a couple more shots. It was at that point that she looked out. She saw the officer falling, and saw the man who shot him pick up the officer's gun. She then saw the man run back to the car, get in, and drive away. She thought he was in the passenger side, and the lady was driving. She identified Gay as the man she had seen.

Holt also testified on cross-examination, however, that she saw Gay get out of the car, walk around the car, and speak to Officer Verna before she heard any shots. He did not get back into the car until Pamela drove up the street and turned it around.

After the incident Holt had described the shooter as being light complexioned or of "mixed race." At the preliminary hearing she had testified that she saw the gun in Gay's hand, saw him fire while standing, and saw him run back to the car and get in. She also saw him pick up the officer's gun. There was a pause of minutes or seconds between the first shot she heard and the rest of the shots. She had identified Gay at a lineup, at the grand jury hearing, and at trial as the shooter.

5. ROBERT THOMPSON was on a ladder in front of a house across the street from the place defendants' car was stopped by Officer Verna. He saw

the officer giving a ticket to a woman. He saw two other people in the car: Gay, who appeared to him to be a White male, in the front seat and Cummings, a Black man, in the rear on the passenger side of the seat. He looked again when he heard a noise and saw Officer Verna backing away from the driver's side door holding his chest. He saw a gun held in the right hand of a person in the back seat extending out of the car. The arm holding the gun was medium-black complected. The witness was certain that the arm he first saw extending from the car with a gun in hand was that of the person in the back seat. He had not remembered that when he testified at the preliminary hearing, but after a subsequent "walk through" of the events, he recalled that sequence.[6]

After the first shot, Thompson jumped off the ladder but watched the arm with the gun as he did so. He looked away as he tried to hide behind a bush. At that point he no longer saw the gun. When he looked again he saw Gay get out of the front seat with a gun in his hand and walk toward the officer with his arm at full extension pointing the smoking gun at the officer who was on the ground. Gay stood straddling the officer who was on his back. Cummings did not move out of the backseat of the car.

On the night of the shooting Thompson had told an investigating officer that the man in the rear seat had a gun and had gotten out of the car and shot the policeman. He had recalled other facts after returning to the scene to participate in the reenactment of the events.

6. SHANNON ROBERTS, who was thirteen years old when these events occurred, was at a home about two or three houses from the location of the shooting. He saw Officer Verna giving a ticket to a woman who was standing outside a car. Shannon then turned and went down the driveway, heard a gunshot, turned back, and saw Officer Verna falling backward and Gay shoot at the officer four times. Gay then got into the passenger side of the car, the woman got into the driver's side and they left. A Black man was in the rear seat. The first car was silver gray. Later a different car, green-colored, stopped by the officer. The driver got out and picked up the gun. At the grand jury hearing Shannon identified Cummings as the man who picked up the gun, and Pamela as the driver of the car.

---

[6]Thompson also testified that he had not identified either of the defendants at a lineup or in the grand jury proceedings because he did not want to do so. He did not want to get involved at that time. In fact, he could have identified Gay.

Thompson and other witnesses also mentioned that they did not immediately identify Gay from photos because the person in the photos had a scar on his cheek which the person seen shooting Officer Verna did not have. Evidence was offered to establish that Gay suffered facial abrasions during the arrest when he was dragged from the car in which he and defendant Cummings were found. Some witnesses also testified that at the time they saw Gay shoot Officer Verna, Gay had a moustache which he no longer had in the postarrest photos.

7. ROSE MARIE PEREZ was a passenger in a car driving on Gladstone and passing the intersection of Hoyt Street. She looked up Hoyt Street and saw Officer Verna falling backwards. She also saw a light-skinned Black man coming around the back of a car, walking toward the officer. She did not see anything in his hands and did not initially identify Gay as that man at trial, but she had identified him from a photograph at the grand jury hearing and in person at the preliminary hearing. She had also done so earlier in photographs displayed by investigating officers. On redirect examination she testified that at trial Gay's appearance was neater and he had a haircut which removed some sun-bleached hair. He was the same man she had identified earlier, however.

Perez had also seen a person seated in the backseat of the car, but did not see him leave the vehicle. That person had hair similar to that depicted in a photograph of defendant Cummings.

8. GAIL BEASLEY, whose preliminary hearing testimony was admitted at trial, had been in her home in the 12000 block of Hoyt Street, the same house in which witness Marsha Holt had been, when she saw Officer Verna stop the car driven by Pamela and talk to her. She looked again when she heard two gunshots. She saw a Black man with very light skin, six feet tall, with a "gericurl," holding a gun with his arm extended at a forty-five-degree angle, shoot the officer four times. Another man was in the backseat. Pamela was still outside the car.

Pamela Cummings testified that Officer Verna copied information from the check cashing card she gave him for identification onto a field interrogation card.[7] After Officer Verna learned she had no driver's license or registration for the car, and she told him that the other occupants were her husband and her cousin, Verna returned to the car. He bent down, putting his hands on his knees, and leaned in. Pamela, who was then standing near the curb, with the car between herself and the officer, heard a gunshot, saw Verna grab his shoulder, and simultaneously saw the barrel of a gun point straight across the front seat of the car and between the head rests. She could not see who held the gun as Cummings, sitting in the back, obstructed her view. Gay then got out of the car, approached Verna and fired three shots into his back as he attempted to return to his motorcycle. The officer turned back toward his motorcycle, walked back a few feet, fell on his knees, and then turned and fell on his back. Gay stood over Verna, shot him two more times, threw the gun on his body, and picked up the officer's gun. She and Gay reentered the car through the driver's side door. Gay drove up the street, made a U-turn, and retrieved the gun.

---

[7]The street address was close to that of her sister, but off by 10 digits, and, while the year of birth was correct, the day and month were those of her daughter.

Before offering the testimony of those eyewitnesses to the shooting, the People offered evidence of admissions and confessions of the defendants which supported the prosecution theory that although a single gun had been used each defendant had used it to shoot Officer Verna.

Pamela testified that on the night of the murder Gay and Cummings each reenacted the shooting in Robin's bedroom to show Robin what had happened. Gay extended his arm as if holding a gun and said, "Pow, pow, motherfucker. Take this," and said that he "got him good." Cummings used the same words in his reenactment. Prior to the reenactment, Gay had said, "I got him good." At the preliminary hearing Pamela testified that Cummings also made that statement. At trial she denied that he did so.[8]

Gilbert Gutierrez testified that in June 1983, while he was being held on a murder charge and was alone in a holding cell with Cummings, Cummings told him that he, Gay, and Pamela were on their way to "score some cocaine" at the time they were stopped by Officer Verna. When Officer Verna asked him if he had any identification he, Cummings, said he did, pulled out a .38-caliber revolver, and shot the officer in the shoulder. Cummings told Gutierrez that he then got out of the car from the driver's side, shot the officer twice in the back, and then when the officer turned over, shot him again, emptying the gun and said: "There's your fucking I.D." Gutierrez testified that Cummings was proud of shooting Officer Verna and bragged about it. Although Gutierrez had sought special consideration for his testimony and had been told by another inmate how to earn favor by informing, he had not been promised any benefits. He testified even though he had already been convicted because Cummings had made death threats against Gutierrez and his family.

Before Gutierrez spoke to Cummings, he had talked to Gay three times about the events. On the first occasion Gay said that Cummings shot the officer with the first shot coming from the back seat of the car, the second shots after Cummings got out of the car when Cummings shot Verna twice, after which Cummings emptied the gun. Cummings also told Gutierrez that he fired the first shot while in the car, the second ones when he stepped out and shot twice, and then emptied the gun into the officer who was on the ground, saying, "Here's your identification, motherfucker." Cummings told Gutierrez that he had thrown his gun down and picked up the officer's gun,

---

[8]Pamela had been charged initially with the same robberies and murder with special circumstances as her husband, but subsequently had been permitted to plead guilty to two counts of robbery and a charge of accessory to murder. She had not been sentenced at the time she testified. A condition of the plea bargain was that she would testify truthfully as a prosecution witness.

and that Gay had recovered the gun used by Cummings when they went back. That was why some witnesses thought Gay did some of the shooting. It was all right with Cummings if the blame was put on Gay.

Alfred Montes, who had been a trustee while he and Cummings were both confined in the county jail prior to the trial of defendants, testified that Cummings had asked him to deliver two letters to Gutierrez and to tell Gutierrez that if Gutierrez testified against Cummings, Cummings would kill Gutierrez's mother. Cummings also asked Montes to tell Gutierrez, "I don't have nothing to lose. I killed a cop that had medals of valor." Montes delivered the letters to Deputy Ponce.

Detective Holder, to whom Gutierrez had reported Cummings's statements, testified that another inmate, Michael Kanan, had reported a different conversation with Cummings to Holder on September 6, 1983. Holder had made a written record of his conversation with Kanan. He read this document only to Cummings's jury. That document recited that Cummings told Kanan that he and Gay discussed what to do after the traffic stop by Officer Verna since they were wanted for the robberies, were driving a stolen car, and Cummings was armed. Gay said they should kill the officer, but refused to do it himself, so Cummings shot the officer. Cummings said that he "got off on the motherfucker and he fell like a trick. Then homeboy went off and filled the motherfucker full of lead."

Kanan's recitation of Cummings's statement included information which Detective Holder believed was known only to the persons in the vehicle which Officer Verna had stopped—in particular that the group was en route to "score some coke." Pamela, Gay, and Billy Sims subsequently gave Holder the same information about their purpose.

Deputy Sheriff McMullan testified that on July 27, 1984, in the central jail as he and Sergeant Arthur were escorting Cummings, Cummings responded to taunts of other inmates who were chanting "dead man walking" as Cummings went by. Cummings said: "I am no ghost. The only ghost I know is Verna. I put six in him." As he was put in his cell, Cummings stated to Sergeant Arthur: "He took six of mine . . . . If I see you all on the streets I hope you are quicker than Verna."

Deputy Sheriff McCurtin testified that on April 9, 1984, he was watching Cummings and other inmates in the jail shower. As a deputy walked by inmate Brooks said, "There is Paul Verna," after which Brooks and Cummings extended their right arms as if shooting a pistol and said "Pow, Pow." Cummings then said to McCurtin: "Let me show you how it was done. This

is how it was done. First two in the back. Pow, pow. Walked up and four more. Pow, pow, pow, pow." Cummings's arm was then pointing down at the ground. On cross-examination the witness quoted defendant Cummings as having said: "Then *we* put four more." (Italics added.)[9]

Deputy Sheriff LaCasella testified that he had escorted defendants from the courtroom to the main lockup on April 10, 1985. On that date the deputy medical examiner had testified regarding the post mortem examination of Officer Verna, stating that he had numbered the bullet wounds in the order he examined them from one through six. Deputy LaCasella placed Cummings in cell 8 and Gay in cell 9. He later heard Cummings yell: "You know how he got number six don't you?" Gay then replied: "Number six?" Cummings said "yeh," and then yelled: "That's the one I put in the motherfucker."

In addition to evidence regarding the robberies in which defendants were implicated, the People offered evidence that earlier on the day Officer Verna had been shot, Cummings had stolen a Mercedes automobile. That evidence was relevant to motive and, inferentially, premeditation and deliberation. It showed that, accompanied by Gay and Pamela, Cummings had taken that car to a house owned by his grandmother, in which Janet Mays, his former sister-in-law, was living, to conceal the car in a garage. Mays testified that she saw Cummings display a handgun and heard him threaten to shoot Dwayne Norton whose car blocked the garage door, saying he would shoot anyone who got in his way, even the police. Norton testified that after Norton said he would not move the car, Cummings had displayed a revolver and had said he even killed police if they got in his way.

Pamela testified that she was present and saw the gun at that time. She had last seen it earlier in the day at the apartment of Gay and his wife where it was on the shelf on which it was usually kept. She did not know who owned it. "They" both used it. At an earlier time when she and Cummings were staying in a motel, she had handled the gun which fired when she moved it. The bullet imbedded in the wall.

In May 1983, Cummings had displayed a loaded .38-caliber revolver, the same caliber gun used to shoot Officer Verna, in the presence of Deborah

---

[9]This testimony was given before both juries. There was no contemporaneous objection by defendant Gay to admission of the statement implicating him. Later, at the end of the witness's testimony, in response to a request by Gay for a limiting instruction, the court instructed the Gay jury to disregard testimony by McCurtin that Gay was Cummings's crime partner. That jury was not instructed to disregard the testimony that Cummings had stated that "we" shot Officer Verna four more times, however.

Cantu, Pamela's sister.[10] At that time he had stated that if the police tried to get him, he would get them first.

Forensic evidence supported the People's theory that Officer Verna was first shot while leaning forward into the open, driver's side door of the stopped car to speak to the occupants, and was shot four more times after he had fallen to the pavement.

The deputy medical coroner who examined the body of Officer Verna testified that the cause of death was multiple gunshot wounds. The numbers he had assigned to the wounds related only to the order in which he had examined them. Gunshot wound number 6, which the People theorized was caused by the first shot, suggested that the bullet entered the right side of Officer Verna's neck, went down through soft tissue and hit the spine behind the esophagus and trachea, and then went into the left chest, through the left lung, and was recovered near the seventh left rib which was fractured. This gunshot wound differed from the other five in that it occurred at a higher level and traveled downward at a sharp angle. All of the other wounds were to the left side of the back and all went upward through the body. Bullet number 5 had traveled through the body, hit a hard surface, and bounced back into the body. The path was consistent with an entry into the back of a person lying on the ground.

The witness concluded at the time of the autopsy, without speaking to the prosecutor or any investigator and without knowledge of their theory of the case, that wound number 6 might have preceded all of the other wounds and might have been inflicted as the victim bent forward. If that wound had been inflicted first, it would have damaged the spine sufficiently to have brought the officer down quickly. All of the wounds except number 1 were fatal wounds. Number 6 alone would have been fatal. Only wound number 6 was consistent with a shot from the backseat of the car if the officer had been leaning into the car. The other wounds were clustered in a manner which indicated that the officer was already down in a fixed position when they were inflicted.

### The Defense Case

#### Cummings

Cummings's defense was principally an attempt to show through scientific evidence and otherwise that no shot had been fired at Officer Verna from the back seat of the car.

---

[10]Pamela had also displayed the revolver to her brother Paul Smith on May 25, 1983, a week before Officer Verna was shot. Smith saw her take it from the drawer of a dresser in the motel room in which she and Cummings were then living.

A defense pathologist whose testimony was offered by Cummings disagreed with some of the prosecution expert's conclusions as to the track of two of the bullet wounds (Nos. 3 and 5) but agreed with the conclusions of the prosecution expert as to the track of number 6, and, based on the positioning of a mannequin, the possibility that this bullet could have been fired from within a car.

Cummings also offered an expert in forensic chemistry who testified that, based on the quantity of barium and antimony found on the victim's jacket, wounds numbers 2, 4, and 5 had been inflicted from the shortest distance and number 6 from the greatest distance.[11] Cummings attempted to establish by cross-examination of a People's expert that if a shot had been fired from the back seat of the car, gunshot residue would have been found on the back of the left front seat headrest.[12] The People offered evidence in rebuttal, in the form of testimony and photographs of an experiment in which Cummings, himself, was positioned in the car holding a gun at the angle it might have been held during the shooting, that it was possible to shoot from the back-seat without leaving gunshot residue on the headrest.

### Gay

With regard to the robberies with which he alone was being tried, and before his jury only, Gay attempted to elicit testimony from Pamela to

[11]That conclusion assumed, however, that the jacket had been handled in a manner which did not cause more residue to be brushed or shaken off the collar area through which bullet number 6 passed. It did not consider the possibility that because the bullet hole was close to the edge of the jacket, some of the gunshot residue did not hit the jacket.

The opinion that number 6 was fired from the greatest distance is not necessarily inconsistent with a conclusion that this shot was fired from within the automobile since there was testimony that Gay stood straddling the fallen body of the officer, pointing the weapon down at him, and fired three of the shots from that position.

[12]The testimony on this point was inconclusive inasmuch as the parties and the expert could only speculate regarding the position of the rear seat occupant when the gun was fired, about whether his arm was extended at that time, and the length of the arm. The expert had made measurements using himself as the model. He was five feet, ten inches tall. Cummings was six feet, seven inches tall and, presumably, had a longer reach.

A possibility also existed that the headrest had been wiped off prior to testing by a criminalist seven weeks after the murder. (A technician who had done testing for gunshot residue earlier had covered the front seat area.) Evidence had been offered that "possible gunshot residue" was found in the car, but even that evidence was inconclusive. Whether any shot had been fired within the car, regardless of location, front or back seat, was not clearly established by the evidence.

The expert did testify, however, that if a gun had been fired in the car it was surprising that the testing, which covered samples from several areas of the interior of the car, failed to reveal barium or antimony residue which would have positively established that the particles which were found were gunshot residue.

Although none was found on the driver's seat headrest, a significant quantity of possible gunshot residue was found on the seat belt. The People argued that had the shot fired inside the car come from the front seat it would not have left such residue on the seat belt.

exonerate Gay in the Poehlmann robbery. The attempt was unsuccessful. Pamela testified that he did participate in the robbery. The count charging Gay with that robbery had already been dismissed, however. The jury was so advised and was instructed not to consider that charge. Gay's counsel persisted in questioning the witness, asking whether she was aware that the charge had been dismissed for insufficient evidence and whether she was nonetheless saying that Gay was present. She again stated that he was there.

Billy Sims, who had participated in some robberies with Cummings and Pamela, and who testified after the prosecution granted immunity, testified about a robbery committed shortly before June 2, 1983, in which Gay had not participated, during which Cummings had pointed a pistol at the victim and hit the victim over the head with the pistol.

Gay's counsel also sought unsuccessfully to elicit testimony from the prosecution investigator, Officer Holder, that there had been an agreement that Gay's confession to the robbery charges made during plea bargain negotiations would not be used against Gay. Officer Holder testified that there had been no discussion and that there was no tacit understanding to that effect. Counsel also elicited Holder's belief that in the taped interview Gay had been telling the truth when he admitted the robberies, but had lied about other matters. The murder was the other matter discussed in the taped interview.

Gay then presented his defense to the murder charge, attempting to cast principal blame on Cummings. This evidence was heard by both juries, over the objection by counsel for Cummings that Gay's defense was irrelevant and prejudicial to Cummings.

Gay called several of the eyewitnesses to the shooting as defense witnesses. Rosa Martin again testified that she saw Gay leave the car which was then driving toward the fallen officer, pick up a gun, reenter the car, and drive it away. She did not see Gay shoot anybody. Rose Perez testified that as she passed through the intersection she saw Gay walk around the rear of the stopped automobile. She did not see anything in his hand. The officer was falling down when she saw this.

Pamela testified that she was sure that a shot was fired from within the car.[13] She saw and heard the shot. Counsel attempted to impeach her by eliciting an admission that she had lied in prior statements about the murder, by asking her about testimony by other eyewitnesses that was inconsistent

---

[13]An objection to counsel's attempt to elicit the opinion of the investigating officer as to whether the first shot was fired from within the car was sustained.

with hers, and by questions designed to undermine the accuracy of her description of the events and to suggest that she was not truthful in stating that she did not know who fired the first shot.[14] Counsel for Cummings then elicited further testimony on cross-examination that she saw Gay slide across the seat of the car, come out firing a gun, and repeatedly shoot the victim.

## PENALTY PHASE

### Gay

The prosecution offered the following evidence in aggravation:

1. Rose Lampinyano, who had dated Gay while in high school in 1976, testified that he had hit her during an argument. The matter had been reported to the police, but she had no present recollection of how often he struck her or whether it was with an open hand or a fist. She had told the truth in telling the police that he struck her in the back and threw her into a fence and into some bushes. She was 15 years old at the time of the incident.

2. Bruce Adams testified that in May 1978 the daughter of his neighbor was dating Gay. He therefore recognized Gay as the man whom he saw leave the neighbor's house and drive away from the home at 1 a.m. after barking dogs had aroused him. As Adams came out of his house he saw the front room of the neighbor's house engulfed in flames. The neighbor's daughter suffered serious burns on her face, hands, and legs. On the prior afternoon, Adams witnessed an argument between Gay and the victim, during which Gay threatened to burn the neighbors out.[15]

The fire was caused by a firebomb thrown through the front window of the house. The neighbor also suffered burns. Gay was convicted of exploding a destructive device causing bodily injury and arson of an inhabited dwelling.

---

[14]In rebuttal, Debbie Warren, who had shared an apartment with the Gays, testified that Pamela and Cummings came to the apartment after the shooting. Pamela told Warren at that time that Cummings shot the police officer from the back seat of the car when the officer was asking for identification. Pamela told her that Cummings had said, "Yeah. I have I.D." and then pulled the gun and started shooting.

Earlier, two weeks or a month before the murder, Cummings had told Warren more than once that if a policeman stopped them "it would be either them or him because he wasn't going back to jail."

Warren, a self-described manic-depressive, became increasingly agitated during her testimony, contradicting herself often and denying her prior testimony. She also testified, however, that after hearing about the killing on television and suspecting from the description of the suspects that defendants were involved, she and Robin picked up Gay. Robin took a change of clothes for her husband and he changed before returning to the apartment.

[15]During his cross-examination of this witness, counsel for Gay brought out that the witness had had a prior "argument" with Gay when the witness intervened while Gay was beating up the victim's father.

3. While confined in the county jail on April 27, 1984, Gay shoved a lighted torch made of newspapers and rolled up toilet paper into the face of another inmate.

4. On December 28, 1983, Gay threatened to come after a jail deputy and his family if he "beat the case," and also threatened physical harm to the deputy if he entered his cell.

5. Gay was one of two men who entered a business establishment on May 2, 1983, held the two employees at gunpoint, and took money from the cash register and other property from the victims.

Gay offered mitigating evidence in the form of testimony by his mother that Gay was the youngest of four children. She had met and married Gay's father, a Black man, when he was stationed in England by the Air Force in 1957. Gay was born the same year and lived in England for the first 13 months of his life, until his father was transferred to March Air Force Base in Riverside County in 1959. The family moved to Los Angeles in 1961 when Gay's father left the service as a staff sergeant. Gay's father worked briefly for an airline and then worked two jobs as a cab driver and service station attendant until he was disabled in a work-related accident in 1976. During the same time Gay's mother was employed as a department store clerk. Gay and his siblings were cared for by a babysitter.

Gay had a good relationship with his father, but he was more open with his mother. His father spanked Gay and both parents always tried to teach him right and wrong. Gay first got into trouble while in junior high school and went to youth camp for family counseling. He did not finish high school, but he received a high school diploma while imprisoned for the arson conviction. On his release in 1982 he was employed as a welder and cook. He received a grant to assist him in attending college at California State University Northridge which he planned to attend in 1983. His interests included writing and art.

Gay did not attend college as planned. He met Cummings through Pamela, whom he had known in high school, and lost interest in college at that time.

Robin married Gay in May 1983. At the time of her testimony she was serving a term for robbery and being an accessory after the fact to the murder, but she planned to obtain employment and take care of her husband on release. She believed in him and was going to stick by him all the way. She was studying word processing and business education, and she had prior employment as a patrol officer for an alarm company.

During the marriage her husband had never been violent. He had never beaten or shoved her.

Ronald Jenkins, who lived in the same townhouse complex as Gay's parents, met Gay on his release from prison in 1983 and became a friend. He encouraged Gay to apply for employment with his employer and attempted to assist him in other ways. He thought Gay was a quiet and lonely person who was a follower rather than a leader. Jenkins had never seen Gay beat anyone.

Gay's mother-in-law testified that Gay was always a gentleman in her home. He was good to her grandson. Although Gay and Robin had arguments, Gay never beat his wife.

Fred Weaver, M.D., a psychiatrist, had examined Gay after having his staff psychologist undertake comprehensive testing. He had also reviewed the reporter's transcripts and police reports. Based on the information he obtained he concluded that Gay had a difficult childhood because of his mixed racial background. Gay felt that he had no relationship or identification with either race, had to fight both, and felt alone and isolated. His father had abused him. All of this and his close relationship with his mother created problems with authority and led to Gay's difficulties with the law beginning at age 13.

Gay reacted positively to a closely controlled environment, however. It was the opinion of the witness that Gay functioned better in a restricted environment. He would be considered a sociopathic personality under an old classification, and such persons respond to structured and controlled environment. Today the diagnosis would be antisocial personality. Gay had not created problems before while incarcerated and he would probably still be that way if sentenced to life without possibility of parole. The witness emphasized the condition that the sentence was without possibility of parole, explaining that he would have genuine concerns about Gay being back on the street.

Gay's cousin, Richard Kelley, who had known Gay all of his life, spent summers at Gay's home when the two were teenagers. Gay was an "alright" person, thoughtful, and always willing to give his time and share with others.

Claudette Barber had worked with Gay's mother. She met Gay when he was 10 years old. He often came to her home and played with her children. He was a nice, obedient little boy.

Jeanne DeLouth was a neighbor who had known Gay since 1972. He played with her sons for almost five years until her family moved. He obeyed her and as far as she knew was never in serious trouble.

*Cummings*

The prosecution offered the following evidence in aggravation:

1. While confined in the county jail awaiting trial for the murder Cummings had in his possession a stabbing implement, a "shank."

2. On May 23, 1983, Cummings and another person robbed two employees of a business establishment at gunpoint, taking money from the cash register and the wallet of one victim. Cummings threatened to kill the victims if they identified the robbers to the police.

3. While confined in the county jail awaiting trial Cummings concocted a plan to kill Gay and Robin by sending them postage stamps laced with cyanide. He sought the assistance of Jackie Flores, the inmate in an adjacent cell who Cummings believed had connections on the outside. He told Flores that Robin had testified before the grand jury and that Gay was "ratting on him." Flores became a feigned accomplice, notified jailers of the plot, and passed on to Cummings stamps which he told Cummings had cyanide on them, but which had been treated by a police technician with a dye that was visible only under ultraviolet light. Cummings sent two of the stamps to Robin with a friendly letter asking her to reply. The stamps were seized when delivered to Robin.

In response to a question on cross-examination, Flores testified that he had not contacted authorities immediately about Cummings's plan. He did so when Cummings also expressed an intent to break out of jail and to kill two deputies in the van on the way to jail. Cummings also sought Flores's assistance in obtaining guns and grenades.

Cummings offered mitigating evidence of his family background. His older brother, Darrell, testified that Cummings was the middle brother of three. Their father had been employed by Chrysler for about 30 years. Their mother had been employed as a clerk/typist by the department of social services for about 12 years during their childhood. After that she operated a foster home for girls on probation.

Both parents, but primarily their father, administered discipline. Their father did, two or three times a week, using a belt with which he hit the children on the bottom and thigh area ten times. A big man, he hit extremely hard. He also used an extension cord on defendant, leaving scars. Their father never expressed any affection to the brothers. Their father beat them any time an adult accused them of misconduct, without investigating the truth of the charge. Often the beatings were not warranted.

Cummings's grandmother had whipped the boys' father, and had also practiced voodoo. Their father believed she had those powers and sprinkled powders she gave him around the house. There seemed to be a continual power struggle between their mother and grandmother for control of their father. While the children were present their parents regularly fought physically, using fists, knives and items of furniture. Cummings was 13 years old when his mother stabbed his father. He did not understand the fights, and was a passive, introverted boy. Darrell used bats and other weapons to protect Cummings from other people.

After their parents separated, when Cummings was 13 years old, their mother became bitter, stopped attending church, and drank to excess. She invited strangers to the house for parties, and neglected household responsibilities which Darrell had to take over. She stopped taking Cummings to a tutor who had been helping him with homework and had played basketball with him. Cummings had excelled in sports until his leg was broken when an automobile hit his motorcycle. An infection almost caused amputation of the limb, and it continued to cause him problems.

Cummings joined his father in Delaware when he was 17 or 18 years old. He went to prison in that state when he was 18 or 19, and was not released until he was 26 years old. On his return to California he was very different.

Sonja Walker, who had been Cummings's girlfriend for five or six years beginning when they were in junior high school, saw Cummings's mother in an intoxicated condition on two occasions. Cummings spent more time at her home than his own and at one time moved in with them because he was not getting along with his mother. He was embarrassed and would not talk about the situation. Their relationship ended when Cummings's mother took him away.

## III.

### PRETRIAL ISSUES

#### A. *Venue*

Both defendants contend on appeal that the trial court erred prejudicially in denying their motions for a change of venue to another county or, in the alternative, to another judicial district within Los Angeles County. The basis for the motions was a claim that extensive media coverage threatened to, and did, deny defendants their right under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution to a fair trial by an impartial jury.

The evidence offered in support of the motions established that from June 1983 until the motions were heard in May 1984, there had been extensive coverage of the murder and subsequent investigation in both San Fernando Valley and Los Angeles newspapers, and on two television stations.[16] In addition to factual reports about the murder and ensuing investigation, the media coverage included articles about the victim, his acts of valor during his 14 years as a police officer, his exemplary character, and the reactions of his family and friends to his murder. The prosecution theory of the case was reported, as were Gay's attempted suicide shortly after his arrest and Cummings's escape and poison schemes. Although the coverage was primarily factual, in May 1984 the Daily News printed an opinion column characterizing the defendants as "murderers" and peace officers as defenders of society. Other articles included what might be characterized as opinion and editorial comment.

The trial court did not find defendants' showing sufficient to mandate a change of venue and postponed final decision on the motions for change of venue until jury selection. The motions were denied when the selection process established to the satisfaction of the judge that few prospective jurors were aware of any facts about the incident and those who recalled reading or hearing about it would be able to decide the case solely on the basis of the evidence offered at trial.

Subdivision (a) of section 1033 commands that a superior court order a change of venue in a criminal case "when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." An appellate court reviewing the denial of a motion for change of venue must make an independent assessment of the evidence we have determined should control the right to a change of venue: "the gravity and nature of the crime, the extent and nature of the publicity, the size and nature of the community, the status of the victim, and the status of the accused." (*People* v. *Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480].) When the issue is raised on appeal, however, the court must also determine whether the pretrial publicity actually had a prejudicial effect, i.e., that it denied the defendant a fair trial by denying him the right to a fair and impartial jury. (*Id.*, at pp. 179-180; *People* v. *Proctor* (1992) 4 Cal.4th 499, 523 [15 Cal.Rptr.2d 340, 842 P.2d 1100]; *People* v. *Harris* (1981) 28 Cal.3d 935, 950 [171 Cal.Rptr. 679, 623 P.2d 240].)

[16]The Los Angeles Daily News, whose primary market was San Fernando Valley, published 27 articles about the case during that period. Together the Los Angeles Herald Examiner and the Los Angeles Times published 24 articles between June 1983 and March 1984. There was heavy coverage on the two television stations in June 1983 and moderate coverage in August 1983—a total of 24 reports.

 Having reviewed the record, we find no error. Even assuming arguendo that there was error it is clear that there was no prejudice. There was no reasonable likelihood at the time the motions were denied that defendants could not obtain a fair trial, and defendants have not shown a reasonable likelihood that, as a result of the denial of a change of venue, a fair trial was not had. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 495 [268 Cal.Rptr. 126, 788 P.2d 640]; *People* v. *Williams* (1989) 48 Cal.3d 1112, 1126 [259 Cal.Rptr. 473, 774 P.2d 146].)

The offense was committed in the state's most populous county. The jury was selected from a radius of 20 miles from the courthouse located in San Fernando Valley thus assuring selection from a population which exceeds that of most counties. The publicity was primarily factual, not sensational, and, notwithstanding the gravity of the offense, the number of news articles and the television coverage were relatively minimal at the time of jury selection and trial. Although the victim was a well-liked police officer and his status was emphasized in the news coverage, he was not a prominent person in the community. Defendants were not strangers in the community. The trial court did not err in denying the motions for change of venue at the time they were made.

 ██ ██ ██ We are also satisfied that the actual process of jury selection did not mandate either a change of venue or a transfer to another judicial district.[17] Very few prospective jurors were excused on the basis of answers to a questionnaire or questions on voir dire stating that prior knowledge of the cause would prevent them from being fair.[18] While the judge herself expressed surprise at the lack of knowledge members of the

---

[17]A transfer between judicial districts is not a change of venue. (*Gray* v. *Municipal Court* (1983) 149 Cal.App.3d 373, 375 [196 Cal.Rptr. 808].) There is no statutory right to such a change in felony cases. (Cf. § 1035.) The Los Angeles County Superior Court Rules, rule 300, section 6, permits an intracounty transfer to promote the ends of justice.

Assuming, therefore, that a judge of the Los Angeles County Superior Court has discretion to transfer a felony prosecution to another judicial district within the County of Los Angeles to avoid potential prejudice from pretrial publicity, identical criteria for transfer and standards of appellate review should govern. We recognize that the expense and inconvenience of a change of venue might be avoided by an intracounty transfer. In the absence of a statutory right to such transfer, however, there is no reason to create a different rule to govern a motion for intracounty transfer.

For that reason it is unnecessary to separately analyze defendants' argument that the court erred in failing to order such a transfer.

[18]When the motion was argued at the close of the *Hovey* voir dire (which had included inquiry into the prospective juror's knowledge of the case; *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]) counsel asserted that 14 prospective jurors had been excused on the basis of bias engendered by media reporting of the case. Our review of the record confirms that at least nine prospective jurors were excused for that reason (Browning, Handson, Russell, Kress, Mobley, Alice, Scheutz, Moro, and McNamee). Even

panel had about the case, we note that jury selection took place a year and one-half after the murder.

Six of the jurors before whom Gay was tried and seven of the jurors before whom Cummings was tried had heard nothing of the case. There was no reason to question the assurances given by the remaining jurors that they could be fair and impartial,[19] as evidenced by the failure of defendants to utilize peremptory challenges to remove any of those jurors.[20] The Constitution requires no more. (*People* v. *Daniels* (1991) 52 Cal.3d 815, 853-854 [277 Cal.Rptr. 122, 802 P.2d 906].)

## B. *Representative Cross-section.*

Defendants moved to quash the venire (see *People* v. *Bell* (1989) 49 Cal.3d 502, 520, fn. 3 [262 Cal.Rptr. 1, 778 P.2d 129]) from which their

assuming that as many as 14 were excused, however, the number is very low in light of the number of prospective jurors who were available.

Six panels of sixty prospective jurors each had been assigned to the court during the selection process. It is not known, of course, whether some of the prospective jurors excused for other reasons, such as hardship, might also have harbored a bias engendered by the pretrial publicity.

[19]The voir dire did not suggest that any of these jurors had any specific recall of the contents of the news reports, and none was challenged for cause. Of those who sat on the Gay jury, Juror Dantzler stated that he had "heard about [the case] on the news when it first happened. I think it was reported on the news." He had not read anything about the case. He remembered only that a police officer had been killed, and responded "no" when asked if he recalled anything that would cause him to be prejudiced for either side. Juror Chin recalled "that I believe I read about the title of this" but had not gone into detail because he did not have time to read the paper. Even though he had read "a little bit about it" he could be fair to both sides.

When asked if she had heard or read anything about the case other than what had transpired in court, Juror Hedeen said "it seems I did, but it has been quite a while ago." She assured the court that if she did recall anything she had read she would be able to disregard it.

Juror Louck had read about the case when it occurred, but did "not remember any specifics to the case. I can't remember what the case was about," could be fair and impartial, and could disregard anything she might later remember. Juror Dobbins had read about the case "briefly," but not during the year since it happened. She was not an "avid" paper reader and did not listen to the news much. She knew "no more about the case than that it happened."

Juror Maxfield had read newspaper reports and remembered that a policeman had been killed in Lakeview Terrace and that three people had been arrested, but said that nothing about that would cause him to be prejudiced.

Cummings, who joined in the argument of Gay on this point, does not identify any jurors who might have been biased as a result of pretrial media coverage. Our review of the record satisfies us that what little knowledge of the case each of them had did not suggest that a change of venue should be granted or compel a conclusion that defendants were prejudiced as a result of the denial of their motions.

[20]Defendants suggest that a failure to utilize available peremptory challenges has no relevance since this may reflect only a concern that replacement jurors might be less satisfactory. Since Gay had 10 and Cummings 9 remaining peremptories, we are not persuaded.

juries were selected. In support of the motion they presented statistical evidence of disparity between the number of Black, Hispanic, and poor persons on the venire and those presumptively eligible for jury service within a 20-mile radius of the North Valley courthouse and within Los Angeles County as a whole. They attributed the disparity to the use of only the voter registration list and Department of Motor Vehicles registration list as the sources of potential jurors and to the practice of assigning persons to courthouses other than North Valley if those courts were also within a 20-mile radius of the prospective jurors' homes. They also claimed that the manner in which the lists were used caused geographic disparity which denied random selection and that excusal and disqualification procedures, as well as failure to establish follow-up procedures to compel the appearance of persons who fail to respond to questionnaires and/or jury summons, contributed to the underrepresentation of those groups.

After receiving evidence from both sides, the trial court found that the criteria for hardship exemption employed by the jury commissioner did not result in constitutionally objectionable underrepresentation. The court concluded that, using unrefined statistical data, defendants had made out a prima facie case of underrepresentation of Blacks and Hispanics which were cognizable groups, ruled that an economic group is not a cognizable group for Sixth Amendment underrepresentation purposes, and found that the People had rebutted the prima facie case using population data that was limited to presumptively jury eligible persons.[21] The People also justified any disparity by establishing that it was caused by permissible factors and practical necessity.

Without explanation or support, Gay argues that the trial court erred in concluding that defendants' prima facie case had been rebutted. Cummings purports to reserve a right to present his arguments in a petition for writ of habeas corpus in which he proposes to offer evidence to demonstrate the disparity between Blacks and Hispanics appearing in the venire and the representation of presumptively jury eligible members of those groups in the North Valley Judicial District. Each appellant claims that a remand should be ordered, and Cummings attempts to reserve the issue, on the basis that this court decided subsequent to this trial that the relevant community for comparison in Los Angeles County is the superior court judicial district. (*Williams* v. *Superior Court* (1989) 49 Cal.3d 736, 744-746 [263 Cal.Rptr. 503, 781 P.2d 537].)

As the People note, however, data regarding the Black and Hispanic population of the North Valley Judicial District is irrelevant in light of the

---

[21]Minors, noncitizens, and non-English speaking persons were excluded. The ruling considered both countywide population and that within the 20-mile radius.

trial court's unchallenged finding that there was no "systematic exclusion," i.e., that the procedures employed by the jury commissioner and the bases for excusing those group members whose excusal was the probable cause of the disparity were constitutionally permissible. (See *People* v. *Bell*, *supra*, 49 Cal.3d 502, 529; *People* v. *Morales* (1989) 48 Cal.3d 527, 548-549 [257 Cal.Rptr. 64, 770 P.2d 244].)

C. *Exclusion of Jurors Opposed to Capital Punishment.*

■ Seventeen prospective jurors were excused for cause based on their opposition to capital punishment. Defendants argue that of those 17, 4 did not express unequivocal opposition or inability to impose the penalty of death in any case and were, therefore, excused improperly. Cummings claims that a fifth prospective juror was also excused improperly. Defendants argue that excusing these jurors denied defendants both the fair trial guaranteed by the Fourteenth Amendment and their Sixth Amendment right to a jury drawn from a fair cross-section of the community. The second claim has been repeatedly rejected by this court. (*People* v. *Fields* (1983) 35 Cal.3d 329, 349-353 [197 Cal.Rptr. 803, 673 P.2d 680].) Defendants offer no basis for reconsideration of those decisions.

■ We reject the first claim. Excusing a juror who expresses opposition to the death penalty is constitutionally permissible if the juror's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his oath." (*Morgan* v. *Illinois* (1992) 504 U.S. __, __ [119 L.Ed.2d 492, 502, 112 S.Ct. 2222]; *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844]; *People* v. *Coleman* (1988) 46 Cal.3d 749, 764-765 [251 Cal.Rptr. 83, 759 P.2d 1260].) It is not necessary that it be "unmistakably clear" that he or she will "automatically" vote against the death penalty regardless of the evidence, however. (See *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522-523, fn. 21 [20 L.Ed.2d 776, 785, 88 S.Ct. 1770]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 767 [239 Cal.Rptr. 82, 739 P.2d 1250].) When the statements of a prospective juror are conflicting or ambiguous, a trial court's assessment of the juror's state of mind binds this court. (*People* v. *Mason* (1991) 52 Cal.3d 909, 954 [277 Cal.Rptr. 166, 802 P.2d 950].)

■ Juror Loboda stated that due to his religion he was against the death penalty and that while he would follow the instructions of the court and would listen to the case, as of the time the voir dire was conducted there was no chance that he would vote for the death penalty. Although he gave conflicting and ambiguous answers to questions by counsel, he responded "yes" to a final question by the court: "[D]o you feel you would automatically impose life without possibility of parole regardless of what evidence was presented at the penalty phase."

Juror Stewart had always been opposed to capital punishment, but initially stated that she could impose the death penalty in an "awfully horrendous" case. She continued to make it clear, however, that she did not believe in capital punishment, and she said if there was a choice between life without possibility of parole and death, the former would be the most extreme that she could do. Pushed, she said that she would "probably" vote automatically for life without parole regardless of the evidence. That she gave the same response to a subsequent question by the prosecutor directed to a case involving the murder of a policeman does not detract from the position she had taken earlier.

Juror Stewart, like others among those whose excusal is challenged, did say that she could be fair and that she would listen to the evidence. The trial court could reasonably conclude, however, that having listened to the evidence, there was no realistic possibility that she would ever vote for imposition of the death penalty.

Juror Samaniego also agreed that he would listen to the evidence. He also said repeatedly, however, that he did not think he could vote for death, would probably vote for life without parole, and felt that he would automatically vote for that penalty regardless of the evidence. He would listen to the evidence and he would consider the death penalty, but he did not know if he could actually vote for it. When pressed for a more specific reply he said, "The answer is no." Finally, in response to the court's attempt to clarify his position, when asked if he would automatically vote for life without parole if the jury had found first degree murder of a peace officer in the performance of his duties, he replied, "Yes, ma'am."

Similarly, Juror Capozzi believed he would vote for life without parole. He said initially that he could listen to the evidence and then determine which penalty was appropriate although voting for death would "weigh" on him. Ultimately, however, he said he probably could not vote for the death penalty. He, too, responded to clarifying questions by the court that he felt he would vote for life without parole and believed he could never vote for the death penalty.

Juror Noel opposed the death penalty. She stated initially that she would automatically choose life. In response to questions of counsel she said she could listen to the evidence, consider whether the death penalty or life without parole would be appropriate, and vote her conscience on whatever she felt would be the proper penalty. Nothing in her response suggests, however, that her conscience would permit her to vote for death. In her case, as in those above, defendants elicited a willingness to listen to the penalty

phase evidence and to consider which penalty would be appropriate, but counsel did not ask the dispositive question—whether the juror, having done so and concluded that death was appropriate, would vote for that penalty notwithstanding his or her previously expressed inability or unwillingness to do so.

The jurors' answers were conflicting and ambiguous. The trial court's decision to excuse them, made prior to the decision of *Wainwright* v. *Witt, supra,* 469 U.S. 412, reflects an implicit conclusion that each would automatically vote against the death penalty regardless of the evidence. That conclusion is supported by the record, and necessarily establishes that the jurors' views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.,* at p. 424 [83 L.Ed.2d at pp. 451-452].)

Gay's claim that it was improper to explore the attitude of the jurors toward the case before them during the death qualification voir dire lacks merit. Although the court need not permit such questioning at that stage of the voir dire, a juror's attitude toward the case is not, as Gay asserts, irrelevant to a challenge for cause. (*People* v. *Pinholster* (1992) 1 Cal.4th 865, 916-917 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People* v. *Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr. 399, 789 P.2d 127].)

### D. *Peremptory Challenges—Cummings's Jury.*

■ Cummings also claims that he was denied a jury drawn from a representative cross-section of the population in violation of his rights under the Sixth Amendment of the federal Constitution and article I, section 16 of the California Constitution when the trial court erroneously permitted the prosecutor to exercise peremptory challenges to two Black jurors. He contends that he made a prima facie showing that Black jurors were being excused by the prosecutor on the basis of group bias, that the prosecutor's justifications were pretextual, and that the court failed to adequately scrutinize those justifications. (See *People* v. *Wheeler* (1978) 22 Cal.3d 258, 276-278 [148 Cal.Rptr. 890, 583 P.2d 748].)

Following the *Hovey* voir dire (*Hovey* v. *Superior Court, supra,* 28 Cal.3d 1) four persons identified as Black were among the prospective jurors on the panel from which Cummings's jury was drawn. Of these, one was excused by the court over Cummings's objection on grounds of personal hardship. One served as a juror. The prosecutor exercised peremptory challenges to excuse the other two jurors, Leon Passmore and Clarence Broussard.

In response to Cummings's objection to the prosecutor's exercise of his third peremptory challenge to excuse Passmore, the court ruled that he had

not made a prima facie case that group bias motivated the challenge. During the selection of alternate jurors, the prosecutor exercised his 18th peremptory to challenge Broussard. Cummings made another *Wheeler*-based motion to quash the panel, the court asked the prosecutor for his reasons for challenging the two Black jurors, and, after hearing the response, denied the motion.

The prosecutor assumed that by inquiring, the trial court had implicitly determined that a prima facie case sufficient to require justification had been made by Cummings, and Cummings urges that reasoning here. We need not decide that threshold question, however, because we agree with the People that the prosecutor adequately justified his actions. With respect to Passmore he explained that the prospective juror lived in Lakeview Terrace, might know some witnesses whose names were not yet available, and might know either the paramedic who treated the murder victim or another who was to be a witness, had indicated on his juror questionnaire that the defendant might know him, and had acknowledged that persons he supervised at work knew Cummings and he had heard about Cummings's background from fellow employees. With respect to Broussard, whom the prosecutor had not questioned extensively during the earlier voir dire, the prosecutor explained that the prospective juror's opposition to the death penalty was a factor. Broussard's brother had been convicted of a crime and may have been prosecuted by another deputy in the same office. Broussard had said he was not sure his brother was guilty, and Broussard appeared to give the prosecutor "dirty looks." In addition, both prospective jurors appeared to be friendly with prospective Juror Redmond and might feel some resentment that he had been excused.[22]

The trial court ruled that there had been "effective showing of why the peremptories were utilized in this case, and there has been no showing of group bias." We agree. The prosecutor offered adequate justification, unrelated to group bias, for the exercise of peremptory challenges. (*People* v. *Sandoval* (1993) 4 Cal.4th 155, 174-175 [14 Cal.Rptr.2d 342, 841 P.2d 862]; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1221-1222 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Wheeler, supra,* 22 Cal.3d 258, 277, fn. 18.) It was not necessary for the court to make additional inquiry. There is no basis in the record for the assertion that the court failed to scrutinize the prosecutor's reasons to determine if they were pretextual. (*People* v. *Johnson, supra,* 47

---

[22]Prior to being excused on hardship grounds after telling the court that he had domestic difficulties that might affect his ability to be fair, Redmond had been questioned extensively in chambers about what appeared to be perjury in denying that he had been arrested. He explained that he understood the juror questionnaire inquiry as one directed to being "arrested and convicted."

Cal.3d at p. 1222; cf. *People* v. *Turner* (1986) 42 Cal.3d 711 [230 Cal.Rptr. 656, 726 P.2d 102]; *People* v. *Hall* (1983) 35 Cal.3d 161 [197 Cal.Rptr. 71, 672 P.2d 854].)

### E. *Severance/Dual Juries.*

The trial court denied motions by Gay to sever the robbery and murder counts, and by both defendants for separate trials on the murder count. The court denied Gay's motion to sever the robbery counts and ordered that each defendant be tried by a separate jury instead of ordering a complete severance of defendants. Both juries heard evidence relevant to the murder and special circumstances charges. The Gay jury also heard evidence relevant to the robberies with which he was charged. Some evidence of Cummings's participation in robberies was also heard by his jury to establish that he had a motive to kill Officer Verna. Penalty phase evidence was presented separately to each jury.

Both defendants argue that the court's denial of their motions for complete severance and the impanelment of dual juries instead was prejudicial error. Each offers reasons for prejudice in his own case.

### 1. *Gay: Severance of robbery counts.*

 The robbery and murder counts were properly joined. (§ 954; *People* v. *Johnson* (1988) 47 Cal.3d 576, 587 [253 Cal.Rptr. 710, 764 P.2d 1087].) Therefore, Gay had the burden to clearly establish a danger of prejudice sufficient to warrant severance. (*People* v. *Sandoval, supra,* 4 Cal.4th 155, 173; *People* v. *Bean* (1988) 46 Cal.3d 919, 938 [251 Cal.Rptr. 467, 760 P.2d 996].) Denial of a severance motion may be an abuse of discretion if the evidence related to the joined counts is not cross-admissible; if evidence relevant to some but not all of the counts is highly inflammatory; if a relatively weak case has been joined with a strong case so as to suggest a possible "spillover" effect that might affect the outcome; or one of the charges carries the death penalty. (*Frank* v. *Superior Court* (1989) 48 Cal.3d 632, 639 [257 Cal.Rptr. 550, 770 P.2d 1119]; *People* v. *Balderas, supra,* 41 Cal.3d 144, 173.)

 Gay claims that considerations favoring severance were present in his case, but the trial court failed to give his motion the careful scrutiny required in a capital case. To the contrary. Review of the record makes it clear beyond any doubt that the trial court gave full consideration to all of

the arguments for severance of counts and defendants, considered the options available, and, only after doing so at several stages prior to trial, denied the severance motions and elected the dual jury procedure.[23]

Gay argues that severance of the robbery and murder counts was mandated because the evidence to be offered on those charges was not cross-admissible. He asserts that the robbery evidence was not relevant to any issue in the murder prosecution and was highly inflammatory; as evidence of motive that might be relevant to deliberation and premeditation it was speculative and cumulative; and the evidence identifying Gay as the robber in the several crimes for which he was tried was weak and made his conviction of both the robberies and the capital offense more likely.

We disagree on all points. The trial court did not abuse its discretion in denying the motion to sever the robbery counts. The court ruled that evidence of the robberies would be admissible on trial of the murder charge to establish the motive for the killing of Officer Verna. The motive, avoiding arrest, was circumstantial evidence of premeditation and deliberation, both of which are elements of first degree murder, and motive was itself an element of the special circumstance of murder for the purpose of avoiding arrest. It is true, as Gay claims, that evidence of the murder might not have been admissible at a separate trial of the robbery counts, but complete cross-admissibility is not necessary to justify joinder. (*People* v. *Mason*, *supra*, 52 Cal.3d 909, 934.) The state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of evidence. (*People* v. *Walker* (1988) 47 Cal.3d 605, 622-623 [253 Cal.Rptr. 863, 765 P.2d 70].)

 Although, as Gay now argues, some of the robbery victims did not identify him at trial, the propriety of a ruling on a motion to sever counts is judged by the information available to the court at the time the motion is heard. (*People* v. *Price* (1991) 1 Cal.4th 324, 388 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *Frank* v. *Superior Court*, *supra*, 48 Cal.3d 632, 640; *People* v. *Johnson*, *supra*, 47 Cal.3d 576, 588.) At that time it appeared that the evidence that Gay participated in the robberies with which he was charged would be quite strong since it was to be introduced through accomplice

---

[23]After Cummings had entered guilty pleas to the robbery counts the court considered the severance motions anew and ruled that the defendants would be tried by separate juries. This procedure would avoid prejudice to Cummings whose jury would not hear the evidence offered against Gay on the robbery counts with which he was charged. Following trial on those counts, the murder prosecution would proceed before both juries. Although some evidence of the robberies would be introduced on the trial of the murder count, the prosecutor advised the court that no inflammatory evidence of the pistol whipping suffered by the victims would be offered.

testimony. And, notwithstanding Gay's claim that his taped confession was erroneously admitted, it is clear that he suffered no prejudice in the jury determination of his guilt of the robberies as a result of joinder with the murder charge.[24] Since he was also identified as a participant by several eyewitnesses to the murder, we see no possibility that the jury was improperly influenced by the evidence of the robberies in finding him guilty of murder.

 Gay's final claim, that he was prejudiced at the penalty phase of the trial because joinder allowed the jury to hear evidence of one robbery count that was dismissed, is not persuasive. Even assuming error in denial of the motion to sever the robbery and murder counts, there was no prejudice. The number of other robbery counts and the nature of the aggravating evidence obviate any possibility that this evidence played a part in the penalty determination.

2. *Severance of defendants; dual jury.*

Gay claims that the court was aware when his motion was denied that extrajudicial statements of Cummings implicating Gay would be offered; that the testimony of Deputies McCurtin and LaCasella on cross-examination by Cummings, and of Pamela, did put such evidence before his jury in violation of the *"Bruton/Aranda* rule" (*Bruton* v. *United States* (1968) 391 U.S. 123, 137 [20 L.Ed.2d 476, 485-486, 88 S.Ct. 1620]; *People* v. *Aranda* (1965) 63 Cal.2d 518, 526 [47 Cal.Rptr. 353, 407 P.2d 265]) and *People* v. *Graham* (1969) 71 Cal.2d 303, 331 [78 Cal.Rptr. 217, 455 P.2d 153]; and that the court's limiting instructions were not adequate to prevent prejudice.

Cummings argues that the dual jury procedure necessarily caused each jury to fear that the other might acquit the defendant whose case the other jury had heard, and thus his jury would be motivated to convict to ensure that someone would be punished for the killing. Cummings also claims that because the prosecutor relied on a "two shooter" theory each defendant had an incentive to attempt to shift all of the blame for the murder to the other. As a result of the inconsistent defenses and strategies

---

[24]The People suggest that any error with respect to the impact of joinder on the robbery charges was waived in any case since the basis for Gay's motion was the impact of joinder on trial of the murder charge.

The written severance motions and supporting points and authorities, like most filed motions in this case, were filed by and largely argued by counsel for Cummings. Counsel for Gay joined in Cummings's motion, but offered little, if any, oral argument on the occasions the motions were heard. Because the concerns of Cummings and Gay differed on occasion it is difficult, on this record, to ascertain when a particular ground was urged by Gay. We nonetheless give him the benefit of the doubt and consider his claim on the merits.

of the defendants, coupled with what both defendants claim was incompetent representation of Gay by his attorney,[25] Cummings was denied a fair trial. Gay's attorney became a "gratuitous" second prosecutor who elicited evidence that was not only harmful to Gay, but also harmed Cummings.

■■■ Granting separate trials is a matter committed to the sound discretion of the trial court. Antagonistic defenses alone do not compel severance. "The court should separate the trial of codefendants 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " (*People* v. *Turner* (1984) 37 Cal.3d 302, 312 [208 Cal.Rptr. 196, 690 P.2d 669], quoting *People* v. *Massie* (1967) 66 Cal.2d 899, 917 [59 Cal.Rptr. 733, 428 P.2d 869]. See also *Zafiro* v. *United States* (1993) __ U.S. __ [122 L.Ed.2d 317, 113 S.Ct. 933].)

■■■ Defendants' claim that several of these considerations were present and mandated complete severance lacks merit. There was no danger of confusion from multiple counts. The joint trial involved only the murder count. Since defendants were crime partners in several of the robberies and in the murder, prejudicial association with a codefendant is not a factor. There is no evidence that either defendant would have offered testimony exonerating the other had they been tried separately.[26] Only their inconsistent defenses and the anticipated introduction of extrajudicial statements in

---

[25] We address Gay's claim of constitutionally ineffective representation by counsel elsewhere in this opinion. Cummings, of course, lacks standing to complain of the quality of representation afforded Gay.

To the extent that Cummings argues that joinder resulted in admission of evidence damaging to him through Gay's attorney, we find no merit in his claim. In each instance to which he points, the evidence elicited, introduced, or admitted without objection by Gay's attorney was relevant and admissible.

[26] Gay argues that had there been separate trials his wife would have offered testimony exonerating him. She had testified before the grand jury that in their apartment, after the shooting, Cummings "reenacted the whole thing and said that the cop grabbed his neck, he spun round and went down to his knees, and he got out of the car—Raynard Cummings got out of the car and shot the cop to death."

The prosecutor sought to call her at trial to testify regarding Cummings's admission, but she asserted her Fifth Amendment rights. The prosecution sought immunity for her and an order to compel answers pursuant to section 1324. The immunity was to be limited to the incidents in the apartment after the murder. The prosecutor agreed with counsel for Cummings that if Robin testified she would be subject to cross-examination regarding her earlier testimony about robberies for which she had not been charged. When the limited nature of the immunity was explained to her, she again asserted her Fifth Amendment rights and did not testify.

The possibility that his wife might offer exonerating testimony was not called to the attention of the court by Gay's attorney at the time the motion for severance was made and heard, however. The record suggests that her subsequent refusal to testify may have been

which defendants implicated each other suggested that severance might be necessary. The trial court elected the dual jury procedure in recognition that some of that evidence would not be admissible against the nonspeaking defendant. The inconsistent defenses alone did not mandate complete severance.

█ The use of dual juries is a permissible means to avoid the necessity for complete severance. The procedure facilitates the Legislature's statutorily established preference for joint trial of defendants and offers an alternative to severance when evidence to be offered is not admissible against all defendants. (§ 1098; *People* v. *Harris* (1989) 47 Cal.3d 1047, 1075 [255 Cal.Rptr. 352, 767 P.2d 619].) Whether the court abused its discretion by denying complete severance and impaneling separate juries is decided on the basis of the facts known at the time of the ruling on the severance motion. █ At the time this ruling was made the prosecution did not intend to use any statements by Cummings which incriminated Gay. █ When the trial court's denial of severance and impanelment of dual juries is urged as error on appeal after trial, however, the error is not a basis for reversal of the judgment in the absence of identifiable prejudice or "gross unfairness . . . such as to deprive the defendant of a fair trial or due process of law." (*People* v. *Turner, supra,* 37 Cal.3d 302, 313. Accord, *Zafiro* v. *United States, supra,* __ U.S. __ [122 L.Ed.2d 317].)

█ That defendants have inconsistent defenses and may attempt to shift responsibility to each other does not compel severance of their trials (*People* v. *Boyde* (1988) 46 Cal.3d 212, 232-233 [250 Cal.Rptr. 83, 758 P.2d 25]), let alone establish abuse of discretion in impaneling separate juries. Here, as in *Boyde,* the defense positions were antagonistic because the identity of the killer was disputed by defendants. That each was involved in the incident was undisputed, however, and the prosecution had offered evidence sufficient to support verdicts convicting both defendants. As the People observe, this was not a case in which only one defendant could be guilty. The prosecution did not charge both and leave it to the defendants to convince the jury that the other was that person. Here the prosecution theory was that both defendants participated in, and were guilty of, the murder.

based on concern that cross-examination by Cummings's counsel might implicate her in the robberies about which she had testified earlier. That implication is not sufficient to establish demonstrable prejudice arising from the joinder, however. It does not establish that Robin would have testified or that had she done so her testimony would have been consistent with her grand jury testimony. The prosecutor made it clear that the immunity would not cover her past grand jury testimony.

Most importantly, Robin exercised her right against self-incrimination and declined to be a prosecution witness. Gay could have sought leave to, but apparently made no effort to, call his wife as a defense witness to testify before his jury alone.

Most of the additional evidence each defendant offered to support his attempt to shift blame to the other would have been admissible had the prosecution sought to offer it. In these circumstances there was no abuse of discretion in denying complete severance and no prejudice as a result of joint trial on the murder charge before separate juries.

 Although the Gay jury did hear three extrajudicial statements by Cummings which arguably implicated Gay,[27] there was no gross unfairness to either defendant. Indeed, by impaneling separate juries for defendants the trial court acted to minimize any impact the defendants' respective trial strategies might have on the other defendant. The jury trying each defendant was fully aware that the other was attempting to avoid his own responsibility by shifting blame. Each jury heard only the closing argument of the defendant whose guilt it was to decide, and each was able to determine guilt solely on the basis of the evidence relevant to that defendant.

## IV.

### GUILT PHASE ERROR—MURDER COUNT

A. *Evidentiary Rulings.*

1. *Mays/Norton testimony.*

 Cummings contends that the evidence regarding his threat to Dwayne Norton on the afternoon before the murder was inadmissible under

---

[27]Deputy McCurtin testified that he overheard Cummings state, "then we put four more . . . ," referring to the shots that killed Officer Verna. The jury was admonished to disregard McCurtin's testimony that Cummings was referring to his "crime partner" when he said "we."

Pamela testified that Cummings told her that when Gay was asked for a driver's license, Gay said "I've got a driver's license for you" and then raised the gun and shot the officer. The jury was also admonished to disregard this statement. Assuming that these statements were inadmissible, the impact could not have been prejudicial by any standard. While the admonitions did not cure the error (see *Bruton* v. *United States, supra,* 391 U.S. 123, 137 [20 L.Ed.2d 476, 485-486]), it was clear from the testimony of four eyewitnesses that Gay as well as Cummings took part in the shooting, and Pamela's recitation of Cummings's statement followed her testimony that Gay himself had described the shooting to her and said "I got him good."

The third statement came in through the testimony of Deputy LaCasella who overheard Cummings, referring to gunshot number 6, remind the nearby Gay: "That's the one I put in . . . ," which implied that Gay had fired the remaining shots. There was no objection by Gay and no request that the jury be admonished to disregard that evidence. The People argue that the evidence of Gay's silence in the face of the accusation by Cummings was admissible as an adoptive admission, and the accusation was admissible to establish the admission. (Evid. Code, § 1221; *People* v. *Silva* (1988) 45 Cal.3d 604, 623-625 [247 Cal.Rptr. 573, 754 P.2d 1070].)

subdivision (a) of Evidence Code section 1101 as evidence of prior bad acts.[28]

The evidence was not, however, offered as evidence of Cummings's character or to prove his conduct at the time of the murder, and it was highly relevant. Evidence that Cummings was in possession of a handgun and had threatened to kill any policeman who got in his way went to his motive for shooting Officer Verna and thus to the elements of intent, premeditation and deliberation. It was also relevant to the purpose element of the special circumstance of killing to avoid arrest. The time frame was such that a jury could reasonably infer that the intent to kill police officers stated at that time still existed at the time of the killing. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1014-1015 [264 Cal.Rptr. 386, 782 P.2d 627]; *People* v. *Karis* (1988) 46 Cal.3d 612, 636-637 [250 Cal.Rptr. 659, 758 P.2d 1189].)

Cummings also argues that the evidence was more prejudicial than probative. (Evid. Code, § 352.) He did not expressly object on that ground. The trial court apparently inferred that this objection was encompassed in the stated objection and argument of counsel and made an express ruling, in overruling the objection, that the threats and possession of the gun were highly probative. Assuming that the objection was properly made, we agree that the evidence was highly probative.

## 2. *Testimony of Deputy LaCasella.*

Cummings objected to the testimony of Deputy LaCasella regarding the incriminating statements by Cummings which LaCasella had overheard. LaCasella had been acting as a courtroom bailiff prior to the decision to call him as a witness. Cummings objected to admission of his testimony on grounds that admitting the testimony of a trusted court officer, who had been involved in seating and escorting the jurors and relaying juror messages to the court, would deny due process and a fair and impartial trial.

Neither *Turner* v. *Louisiana* (1965) 379 U.S. 466 [13 L.Ed.2d 424, 85 S.Ct. 546], nor *Gonzalez* v. *Beto* (1972) 405 U.S. 1052 [31 L.Ed.2d 787, 92 S.Ct. 1503], on which Cummings relies, supports the broad rule he would invoke. In *Turner*, the principal prosecution witnesses were two deputies who had investigated the homicide for which Turner was on trial and who acted as courtroom deputies during the trial and deliberations. They freely

---

[28]Evidence Code section 1101 states: "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

mingled and conversed with the jurors in and out of the courthouse. The court had not directed the deputies to cease their association with the jurors.

On those facts the Supreme Court held that the right to trial by jury had been compromised. "It would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were *not* deputy sheriffs. But the role that [the deputies] played as deputies made the association even more prejudicial. For the relationship was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial. And Turner's fate depended upon how much confidence the jury placed in those two witnesses." (*Turner* v. *Louisiana, supra,* 379 U.S. at p. 474 [13 L.Ed.2d at pp. 429-430].)

*Gonzalez* v. *Beto, supra,* 405 U.S. 1052, was a summary reversal. The concurring opinion of Justice Stewart, in which Justices Douglas and Marshall joined, reveals that the facts were similar to those in *Turner* and reversal was predicated on the same reasoning. The key prosecution witness was a county sheriff who also served as courtroom deputy. His testimony on cross-examination was interrupted so that he could retire the jury, and he continued to serve in his role as bailiff through the end of the trial and deliberations.

The trial court carefully considered LaCasella's involvement in courtroom activities and ruled that his association with the jurors was so minimal and so professional that the probative value of his testimony outweighed any prejudice to Cummings from his status. We agree. Cummings cannot claim an immunity for his extrajudicial statements on the ground that it happened to be a bailiff who overheard the statements.[29] The court did not err in admitting the testimony.

The events in this case are clearly distinguishable from those in *Turner* v. *Louisiana, supra,* 379 U.S. 466 and *Gonzalez* v. *Beto, supra,* 405 U.S. 1052. Deputy LaCasella had no role in the investigation of the case and was not identified prior to trial as a possible witness in the case. He was not the principal or "key" prosecution witness. He had relatively little direct contact with members of the jury and was promptly relieved of his courtroom duties when he became a witness. The jury was admonished that all witnesses'

---

[29]LaCasella and another bailiff also participated in a demonstration regarding audibility in the lockup area in which Cummings was confined when his statements were overheard. This does not affect our conclusion. Only LaCasella could testify regarding Cummings's tone of voice. Participation in simulations offered as demonstrative evidence does not carry with it the danger that credibility of a witness will be enhanced by virtue of his role as a bailiff and his association with the jury.

testimony was to be judged on the same basis and that no greater weight should be accorded to LaCasella because he had been a deputy in the court. Neither defendant's right to a fair trial, nor his right to jury trial was undermined by the admission of LaCasella's testimony.

### 3. *Demonstrative evidence.*

■ Defendants argue that the court abused its discretion in permitting the prosecution to use a mannequin to illustrate the paths of the six bullets through the body of Officer Verna. Using dowels to demonstrate those paths, the prosecution attempted to assist the jury in understanding the testimony of the expert witnesses, forensic pathologists. The prosecution expert had testified that the path of bullet number 6 was consistent with a bullet shot from within the car as the victim leaned over and into the car. The defense expert, who disagreed with the prosecution expert on one of the shots, did not dispute the theory that the first shot, number 6, could have been fired in that manner.

Cummings also argues that it was improper to admit photographs of defendants and a bailiff posed in and next to a car to illustrate the prosecution's theory that the first shot could have been fired from the backseat of the car without depositing gunshot residue on the headrest of the front seat and other areas within the car.

Gay failed to object to the simulations. In any event, the court did not err. Mannequins may be used as illustrative evidence to assist the jury in understanding the testimony of witnesses or to clarify the circumstances of a crime. (*People* v. *Robillard* (1960) 55 Cal.2d 88, 99-100 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Fitzgerald* (1972) 29 Cal.App.3d 296, 316 [105 Cal.Rptr. 458].) Photographs of an accurate reconstruction of an event in issue are also admissible. (*People* v. *O'Brien* (1976) 61 Cal.App.3d 766, 780 [132 Cal.Rptr. 616].) The issues to which this evidence was relevant were hotly disputed. The expert testimony was confusing at times. The probative value of the evidence clearly outweighed any prejudice to Cummings.[30]

---

[30]Cummings claims that the mannequin was "misleading," but fails to persuade us that this characterization is warranted. He says that the mannequin did not purport to match the exact size or body form of Officer Verna, but does not indicate how any variation affected the ability of the jury to assess the evidence.

On one occasion subsequent to the prosecutors' use of the mannequin in the courtroom to illustrate the pathologist's testimony, the jurors were permitted to sit in the back seat of the car while lawyers for each defendant manipulated the mannequin to illustrate the defense

### 4. *Hearsay statement of Michael Kanan.*

Cummings objected to the admission of a record made by Detective Holder of Holder's interview with Michael Kanan. During the interview Kanan told Holder that Cummings said that he and Gay had discussed killing a police officer if they were stopped while driving a stolen car and were wanted for robbery. ██ ██ He objected on grounds that the evidence was hearsay,[31] the admission of which denied him his right to confront and cross-examine Kanan,[32] and that the evidence was not admissible under the "past recollection recorded" exception to the hearsay rule. (Evid. Code, § 1237.)[33]

Kanan had initiated contact with the detective while an inmate in the county jail. He said that his conversation with Cummings occurred while both were being transported to court appearances. Kanan testified that he had

theories. Any discrepancy between the size of the mannequin and that of the victim could easily have been pointed out to the jurors.

[31]Cummings did not object on grounds that Holder's testimony was "double hearsay" in that Kanan recited out of court statements by Cummings. Assuming that Holder's testimony regarding Kanan's statement was admissible, Cummings's statement to Kanan was admissible under the exception for statements of a party. (Evid. Code, §§ 1201, 1220.)

[32]Admission of evidence pursuant to Evidence Code section 1237 does not impermissibly deny defendants their federal Sixth Amendment or state article I, section 15 constitutional rights to confrontation and cross-examination if the record of the witness's past statement is properly authenticated and the statutorily required foundation for admission is laid. (*People* v. *Simmons* (1981) 123 Cal.App.3d 677, 682 [177 Cal.Rptr. 17].)

Cummings not only was given the opportunity to, but did extensively, cross-examine Kanan. (Cf. *People* v. *Brock* (1985) 38 Cal.3d 180 [211 Cal.Rptr. 122, 695 P.2d 209].) The bias, lack of recall, use of memory-affecting drugs, and all matters relevant to the credibility of the witness, both at the time he made his statement and at the time of his testimony were fully explored. That is sufficient to satisfy the Sixth Amendment. (*United States* v. *Owens* (1988) 484 U.S. 554, 559-560 [98 L.Ed.2d 951, 957-959, 108 S.Ct. 838].) Article I, section 15 of the state Constitution requires no more. (*In re Damon H.* (1985) 165 Cal.App.3d 471, 477, fn. 6 [211 Cal.Rptr. 623].)

[33]Evidence Code section 1237 permits evidence of a witness's past statement "if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:

"(1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory;

"(2) Was made . . . (ii) by some other person for the purpose of recording the witness' statement at the time it was made;

"(3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and

"(4) Is offered after the writing is authenticated as an accurate record of the statement."

Evidence Code section 1350, which might now afford an alternative basis for admission of the statement, had not been enacted at the time of the trial in this case.

no recall of the conversations with Cummings or Holder, had been undergoing detoxification, was sometimes delusional, and was still having drug-related problems at the time of trial. He testified, however, that what he told Holder was the truth. He admitted that his motive for talking to Holder was to arrange a deal to get out of jail. Other "snitches" taught him how to inform.

The record of Kanan's statement made by Detective Holder was authenticated by Holder who testified regarding the method of its preparation and by Kanan who testified that he was unable to recall the content of his conversation with Cummings, but he had truthfully reported it to Holder while it was fresh in his mind.

At an in camera hearing on a motion by Cummings to strike Kanan's testimony[34] made subsequent to admission of Kanan's statement, counsel for Cummings testified that Kanan had called him a few hours after testifying, wanted to recant his entire testimony, and wanted to appear to explain the entire snitch system. Kanan failed to keep two appointments, however, and all attempts to locate Kanan thereafter were futile. The motion to strike was denied, but the Cummings jury was instructed that Kanan had indicated an intent to recant his testimony and had then intentionally and purposely avoided efforts by the court and the parties to have him appear.

 Cummings argues that the foundation for admission of the statement was inadequate since Kanan could not testify that his statement to Holder was a true statement of fact. Kanan had no recollection either of Cummings's statement to him or of his own statement to Holder. He had no recall of even talking to Holder.

The record does not support this claim. Kanan testified that he spoke to Holder a few days after the bus ride with Cummings, that the conversation he related was then fresh in his mind, and that he told Holder the truth. On cross-examination he accurately described the location in the bus where Cummings was seated and the special security provisions that segregated and secured Cummings, a "high power" prisoner, in a special holding area.

As the trial judge recognized, whether an adequate foundation for admission of Kanan's statement to Holder had been established turned on whether Kanan's testimony that his statement was true was reliable. (Evid. Code,

---

[34]Cummings sought to strike Kanan's testimony (that he did not recall his statement to Holder) because it was a necessary part of the foundation for admission of Holder's testimony. The parties and the court appeared to understand that the motion to strike was directed to Holder's testimony as well.

§ 1237; *People* v. *Parks* (1971) 4 Cal.3d 955, 960 [95 Cal.Rptr. 193, 485 P.2d 257]; *People* v. *Simmons, supra,* 123 Cal.App.3d 677, 682-683.) Defendant argues that, like the witness in *Simmons,* Kanan could not reliably testify that his statement was true. *Simmons* is distinguishable, however. There, the witness had amnesia and could not recall any of the events in his statement, making it, or any circumstances surrounding the statement. He testified only that he had no reason to lie when he made the statement. Here, by contrast, Kanan had sufficient recall of the events that the trial court had a sufficient basis for concluding that his testimony was reliable. The judge was aware that Kanan had testified that he was delusional and did not know what the facts were, and had said that he did not recall, but, after extensive argument, admitted the evidence. We cannot conclude that she abused her discretion in doing so. She heard the testimony and had the best opportunity to assess the credibility of the witness. Her conclusion that Kanan testified truthfully and reliably when he said that his statement to Holder was true is supported by the record.

We also reject Cummings's claim that the court erred in denying the motion to strike Kanan's testimony. Hearsay evidence that a witness wishes to recant does not mandate striking prior testimony of that witness.

### 5. *Conviction of Robin Gay.*

 Gay contends that the trial court erred in admitting evidence that Robin had been tried and convicted of being an accessory after the murder of Officer Verna. (§ 32.)[35] He argues, with merit, that the evidence was not relevant to any issue, and that if it was introduced as evidence of his guilt, it was inadmissible hearsay.

We agree that the evidence was irrelevant. The People suggest only that the conviction of Robin as an accessory to murder and as a robber tended to show that Pamela's testimony had a basis in fact. If the evidence was admitted for that purpose it was also hearsay, however (*People* v. *Wheeler* (1992) 4 Cal.4th 284, 300 [14 Cal.Rptr.2d 418, 841 P.2d 938]), and lacked relevance for purposes of corroboration. The conviction reflected only the view of a judge or jury that evidence presented in a different case established that Robin had assisted the defendants or either of them after the murder. It

---

[35]Section 32 states: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

did not come within any exception to the hearsay rule applicable to judgments. (See Evid. Code, §§ 788, 1300 et seq.)[36]

Furthermore, although Gay objected to introduction of the evidence on grounds of hearsay (Evid. Code, § 1200), relevance (Evid. Code, § 210), and prejudice (Evid. Code, § 352), the trial court did not rule on the objection that the evidence was more prejudicial than probative. It clearly was. Although Robin's assistance to either her husband or Cummings could have been the basis for the conviction, it is inconceivable that the jury would not understand the evidence to reflect guilt of aiding her husband who, by necessary implication, had committed a murder.

We agree with the People, however, in light of the overwhelming evidence of Gay's guilt, the error in admitting this evidence was harmless.[37]

### 6. *Gail Beasley's preliminary hearing testimony.*

Beasley's preliminary hearing testimony—that she saw a very light-skinned man, six feet tall, with a gericurl, shoot Officer Verna four times—was admitted over hearsay and Sixth Amendment-based objections by Gay after the court found that the People had used due diligence in attempting to locate her. Although she had been subpoenaed and had stated she would appear, she could not be located at the time her prior testimony was

---

[36]The trial court took judicial notice of the judgment (Evid. Code, § 452) which was then read to the jury. The court apparently believed that it was admissible under the official records exception to the hearsay rule. That exception (Evid. Code, § 1280), like the business records exception (Evid. Code, § 1271), permits use of the record only to establish that a judgment was entered, not to establish that guilt has been determined. (*People* v. *Wheeler, supra,* 4 Cal.4th 284, 300; *In re Harold M.* (1978) 78 Cal.App.3d 380, 386-387 [144 Cal.Rptr. 744].)

[37]No emphasis was placed on this conviction. The prosecutor, on the first occasion, asked the court to take judicial notice of Cummings's guilty pleas to 17 robbery, attempted robbery and conspiracy counts, orally reciting each charge, as well as enhancing allegations. The court was then asked to take judicial notice that the court found Robin Gay guilty of robbery as charged in three counts, and further found her guilty of violation of section 32. The request was made in the presence of the Gay jury, but the court recessed and the jurors were not instructed to consider the matters of which judicial notice had been taken.

Later in the trial, before both juries, the prosecutor repeated his request that the court take judicial notice of the same matters. Counsel for both defendants stated "no objection." Again the jurors were not instructed to consider the matters of which the court had taken judicial notice.

All the juries heard, therefore, was the request for judicial notice and a recital of several counts among which was listed the accessory count. That conviction was not mentioned again, either by the court when instructing the jury or by counsel in argument.

admitted. Efforts to serve a body attachment warrant on her had been unavailing.[38]

Beasley appeared prior to the conclusion of the People's case-in-chief, but counsel were unprepared to question her. She was ordered to return, but was not called as a witness subsequently.

 Gay now contends that the court erred in concluding that the People had made sufficient efforts to locate Beasley to warrant the court's ruling that she was "unavailable" within the meaning of Evidence Code section 1291, and that admission of her preliminary hearing testimony therefore denied him his constitutional rights to confrontation and cross-examination. As the People note, however, Beasley was ultimately produced. Gay had the opportunity to, but did not, cross-examine her. He argues that the error was not cured by producing Beasley some eight days after her preliminary hearing testimony was read since cross-examination at that late date would reinforce rather than undermine her direct testimony.

Gay offers no authority for the proposition that the Constitution mandates that cross-examination be available no later than the close of the witness's direct testimony. We see no reason to conclude that the opportunity to cross-examine Beasley at the time she was located did not satisfy constitutional demands. Even if there were merit to that argument, however, his initial claim fails. The evidence was properly admitted.

 A person is "unavailable as a witness" within the meaning of Evidence Code section 1291 if he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) The proponent of the evidence, here the People, has the burden of establishing unavailability by competent evidence. (*People* v. *Price, supra*, 1 Cal.4th 324, 424.) We have stated that whether due diligence was demonstrated is a "factual question to be determined by the trial court according to the circumstances in each case; under familiar rules the trial court's ruling will not be disturbed unless an abuse of discretion appears." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 312 [168 Cal.Rptr. 603, 618 P.2d 149].) More recently, however, we have indicated that independent review might be appropriate. (See *People* v. *Price, supra*, 1 Cal.4th 424; *People* v. *Hovey* (1988) 44 Cal.3d 543, 563 [244 Cal.Rptr. 121, 749 P.2d 776]; *People* v. *Louis* (1986) 42 Cal.3d 969, 984-989 [232 Cal.Rptr. 110, 728 P.2d 180].)

---

[38]Cummings objected that the testimony was incompetent because it was based on speculation rather than personal knowledge of the witness.

■ We have undertaken an independent review of this record. It amply demonstrates due diligence.

Beasley had testified at both the grand jury hearing and the preliminary hearing. Attempts were made to locate her thereafter beginning in January 1984, more than a year before her testimony was needed. Notwithstanding 22 unsuccessful attempts to locate the witness and 1 successful service of subpoena,[39] the court refused to admit the prior testimony at an April 10 hearing, and suggested that a body attachment should be ordered by the court and entered into the countywide computer network making it available to all peace officers. The body attachment was issued and was entered into the computer system.

The prosecutor also agreed to have a patrol car go by Beasley's home every night during the trial in an attempt to serve her. That was done for seven days. An officer on the evening watch went by four times without stopping and stopped on ten occasions during that period. He never saw any indication that Beasley was home or that anyone had been living there. Another officer on the morning watch also attempted unsuccessfully to serve Beasley. The aid of the apartment manager and neighbors was enlisted. None called to report Beasley's return. Her car was never in the parking lot.

The investigator went again to the home of Beasley's mother and showed her the body attachment. He had checked her last employer, believed she was now unemployed and on welfare, and listed at the address the officers had been checking. That was the address on Department of Motor Vehicles records also. Her automobile was registered at her mother's address.

---

[39]Beasley no longer resided on Hoyt Street, but her mother did and was asked to have her contact the investigator. In April 1984, after the investigator made two more visits at the mother's house, he was told where Beasley worked. In October 1984, Beasley called the investigator and said she had been threatened and did not want to testify. She nonetheless agreed to meet the investigator. She failed to keep the appointment.

In November 1984, the investigator went to Beasley's new address, confirmed that she lived there, and left a message with her sister. He also visited what was believed to be her place of employment, but found that she no longer worked there. The next day, November 15, 1984, Beasley was reached by telephone and again agreed to meet the investigator, but she did not. Another visit was made to her home, but she was not in. Once again she called and on November 20, 1984, the investigator was able to serve her with a subpoena. She said she would obey.

On April 4, 1985, Beasley was not at home when the investigator tried to locate her. He confirmed that she still lived at the location and a subpoena was left for her. On April 9, 1985, the subpoena was still in the door, although the manager said that she had been at the apartment 30 minutes earlier and had paid her rent for the month. Beasley's mother was contacted. Another subpoena was prepared and given to an officer for service. Three unsuccessful attempts to serve a subpoena had been made on the night of April 8, 1985, by officers from Van Nuys. On April 10 officers from that station were asked to try again.

The trial court found due diligence. We find due diligence. That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. (*People* v. *Guiterrez* (1991) 232 Cal.App.3d 1624, 1641 [284 Cal.Rptr. 230].) It is enough that the People used reasonable efforts to locate the witness. They did.[40]

## B. *Impact of Uniformed Officers in Courtroom.*

Cummings objected to the presence of numerous uniformed peace officers among the persons attending the trial.[41] Gay objected only on the ground that the presence of the officers affected him personally. Some of those officers were motorcycle officers whose dress was identical to that worn by Officer Verna at the time of his death. These officers occasionally occupied seats in the front row of the audience.

The judge considered the objection and, although expressing doubt that the presence of the officers would have undue influence on the jury, attempted to accommodate Cummings's concern, suggesting that, when possible, officers attending the trial wear civilian clothes. She also ruled that if more than two or three uniformed officers were present at the same time the motion could be renewed.[42] The matter was not raised again during the trial.[43]

 Defendants argue on appeal that the court abused its discretion in permitting any uniformed officers to attend the trial as spectators. We find no abuse of discretion on the part of the trial court. The right to a public trial is not that of the defendant alone. (Cal. Const., art. I, § 29; *Press-Enterprise Co.* v. *Superior Court* (1986) 478 U.S. 1, 7 [92 L.Ed.2d 1, 9, 106 S.Ct. 2735].) The public policy in favor of open judicial hearings was emphasized in this court's opinion in *Press-Enterprise Co.* v. *Superior Court* (1984) 37 Cal.3d 772, 779-780 [209 Cal.Rptr. 360, 691 P.2d 1026]. (See also *Tribune Newspapers West, Inc.* v. *Superior Court* (1985) 172 Cal.App.3d 443, 449 [218 Cal.Rptr. 505].) Only if restriction is necessary to preserve a defendant's right to a fair trial may the court restrict attendance by members

---

[40]Gay also argues that the court abused its discretion in permitting Beasley's prior testimony to be read to the jury during the middle of the People's case-in-chief rather than adhering to an earlier plan to await the completion of the People's case. He did not object on that basis at or before the time the testimony was read, however.

[41]Gay joins in this argument, but does not indicate that he objected at trial. In light of our conclusion that the trial court did not abuse its discretion, we need not consider whether such objection is necessary to preserve a claim of this nature for appeal.

[42]Gay's attorney stated that the presence of the officers sitting so close in the front row made Gay nervous, which in turn made it difficult for him to assist in his defense.

[43]Cummings did assert in his motion for new trial that many uniformed officers were present when the guilt phase verdict was returned.

of the public. Because a First Amendment right of access to judicial proceedings is also recognized, they may not be closed "unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" (*Press-Enterprise Co.* v. *Superior Court, supra,* 478 U.S. 1, 13-14 [92 L.Ed.2d 1, 13].)

 In this case there was no effort to close the proceedings. Nonetheless, Cummings sought to exclude a segment of the public. As members of the public, the police officers had both common law and constitutionally based rights to attend the trial. Exclusion of any group on the basis of the members' status would be impermissible. The trial court sought to balance the rights of those officers whose duty assignments precluded attendance in civilian clothes against the possibility that seeing large numbers of uniformed officers among the spectators would somehow influence the jury. The concerns expressed by Cummings were not sufficient to establish that excluding all uniformed officers was essential to a fair trial, and the record does not support his claim of actual prejudice.

C. *Special Circumstance Finding.*

 Defendants contend that the evidence was insufficient to support the jury's special circumstance finding that the murder was committed for the purpose of preventing lawful arrest. They also contend that the instructions failed to adequately define that special circumstance.

We disagree. Not only was there strong circumstantial evidence to support the finding, but there was also testimony that Cummings had stated more than once that he was not going back to jail and would shoot any police officer who stopped him. Defendants argue, however, that the evidence did not establish that they were under arrest or that arrest was "imminent." Their reliance on *People* v. *Bigelow* (1984) 37 Cal.3d 731, 752 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723], for the proposition that a suspect must have been arrested or that the officer must have formed an intent to arrest before the special circumstance is applicable is unwarranted.

We found insufficient evidence and held that arrest must be "imminent" in *Bigelow* where the defendant killed a robbery victim. The prosecutor theorized that he had done so to prevent the filing of a report and possible identification of the defendant. On those facts we said that the theory was "totally speculative" and was "also an unreasonably expansive reading of the special circumstance of avoiding arrest, a reading which would cause that circumstance to overlap extensively with felony murder. We believe the

special circumstance of avoiding arrest should be limited to cases in which the arrest is imminent." (*People* v. *Bigelow, supra,* 37 Cal.3d 731, 752.)

In *People* v. *Coleman* (1989) 48 Cal.3d 112 [255 Cal.Rptr. 813, 768 P.2d 32], as in *Bigelow,* there was no proximity between the murder and a possibility of arrest. The murder victim was shot as she attempted to escape from defendant, was blocked at the door by defendant, and yelled to a neighbor to call the police. In each case, the victim may have been killed to prevent the police from being summoned. The defendant's long-range goal may have been avoidance of arrest, but the immediate goal was simply to prevent the possibility that the police would eventually learn of the crime and the defendant's relation to it, and then arrest the defendant.

Here, by contrast, defendants had been detained by the police officer victim under circumstances which would lead them and any objective observer to believe that an arrest was highly likely. Arrest was or appeared to be "imminent."[44]

Each jury was instructed that to find this special circumstance true it must have been proved that "the murder was committed for the purpose of avoiding or preventing a lawful arrest." Thus, the juries necessarily found that defendants believed that Officer Verna would arrest them and that they killed him to avoid arrest.

Defendants argue, however, that "imminent" arrest is an element of the special circumstance and, following *People* v. *Bigelow, supra,* 37 Cal.3d 751, failure to instruct on that element withdraws the element from the jury. This, they contend, denies due process.

Our *Bigelow* opinion did not alter the statutory elements of the special circumstance defined in section 190.2, subdivision (a)(5). It construed the section and concluded that the evidence in that case was insufficient to sustain the jury finding. The trial court instructed on each element of the special circumstance. Had the possibility of arrest been more remote, i.e., had there been no peace officer present or less reason to believe the

[44]Defendants both moved for acquittal of the special circumstance pursuant to section 1118.1 on this ground citing *Bigelow, supra,* 37 Cal.3d 731. The trial court noted this factual distinction and correctly denied the motion, finding that the facts showed beyond a reasonable doubt that an imminent arrest was likely.

defendant feared arrest, a supplemental instruction might have been appropriate, but the failure to give one here was not error, let alone error of constitutional dimension.[45]

### D. Griffin Error—Cummings.

Cummings claims that during closing argument the prosecutor improperly referred to his failure to testify thereby violating the command of *Griffin* v. *California* (1965) 380 U.S. 609, 615 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229], forbidding "either direct or indirect comment upon the failure of the defendant to take the stand." Such comment undermines a defendant's exercise of the Fifth and Fourteenth Amendment privilege against self-incrimination.

The statements on which defendant relies for this claim do not reflect reversible error. On one occasion the prosecutor clearly misspoke, doing so in a way the jury could not reasonably have understood to be a comment on Cummings's failure to take the stand. He urged the jury to bear in mind that Cummings expressed pride at causing the death of Officer Verna and to "[b]ear that in mind when you evaluate his testimony." Cummings now argues that because he had not testified the jury would necessarily understand the statement to be a comment on that failure.

We agree with the trial court, which denied Cummings's motion for mistrial based on this statement. The jury would most certainly understand the prosecutor's reference to be to the defense put on by Cummings including testimony offered on his behalf. Even were there some question, reversal would not be required. (*People* v. *Hovey*, *supra*, 44 Cal.3d 543, 572.)

The second statement was the prosecutor's exhortation to the jury to judge Cummings as he was portrayed by the evidence, rather than by his courtroom appearance. During this part of his argument the prosecutor said: "You are not judging what Mr. Cummings does as he sits here in his tennis outfit. That is what these lawyers would like you to think. Clean shaven. He looks nice. Never says anything. Real quiet, et cetera."

Again, there is no reasonable likelihood that the jury could have understood the statement that Cummings "never says anything" to be a comment on his failure to take the stand. The context of the statement made it clear that the reference was solely to Cummings's appearance and demeanor in court as contrasted with the picture painted by the evidence.

---

[45]Even were we to accept defendants' thesis, the failure to add the *Bigelow* gloss to the instruction would not be reversible error. (*People* v. *Odle* (1988) 45 Cal.3d 386, 414-415 [247 Cal.Rptr. 137, 754 P.2d 184].)

There was no *Griffin* error and no impropriety. (*People* v. *Morales, supra,* 48 Cal.3d at p. 571.)

E. *Prosecutorial Misconduct—Cummings.*

■■■ Cummings also argues that the prosecutor engaged in misconduct during his closing guilt phase argument to the Cummings jury by impugning the honesty and integrity of defense counsel.[46] The argument, he contends, led the jury to believe that counsel was engaged in deception.

If there is a reasonable likelihood that the jury would understand the prosecutor's statements as an assertion that defense counsel sought to deceive the jury, misconduct would be established. (*People* v. *Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) It is possible that, taken alone, the prosecutor's argument might have been so understood. However, any implication in the argument that defense counsel engaged in deception was removed by the trial court's admonition, after a defense objection was sustained, that the court was certain that counsel were not trying to impugn the integrity of any parties to the proceedings. ■■■ ■■■ Although the prosecutor again accused the defense of attempting to hide the truth, and used his "ink from the octopus" metaphor several times during closing argument, the context was such that the jury certainly would understand it to be nothing more than urging the jury not to be misled by defense evidence.[47] ■■■ Indeed, Cummings did not renew his objection. Therefore, even assuming any impropriety, the issue was not preserved for appeal. (*People* v. *Miller* (1990) 50 Cal.3d 954, 997 [269 Cal.Rptr. 492, 790 P.2d 1289]; *People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].)

[46]The defense had presented evidence that suggested Cummings had not been in court on the day witness Gutierrez claimed to have shared a holding cell with him. A record which the prosecution introduced indicated that Cummings had been transported to court in error on that date. The prosecutor's argument pointed out the failure of the defense to present that evidence, after which the prosecutor said: "That is educational. Does this tell us a little something about the ink and octopus and what is going on at the other end of the table. [*sic*] I think it should.

"What we are doing here is much too important for this kind of trick. . . .

"Does that make you wonder what they are doing down there? They are supposed to do that. That is their job.

"They are trying to get this man off."

[47]Another instance of which Cummings complains was a reference to a defense attempt to discredit the testimony of Janet Mays and Dwayne Norton with evidence that no police report had been made regarding Cummings's encounter with the pair on the afternoon before the murder. The prosecution had countered that evidence with evidence that a call had been registered under a category of illegally parked cars, although no report was filed.

The prosecutor argued that the defense effort to impeach the witnesses was another effort to confuse the picture by presenting only half of the picture.

An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper. (*People* v. *Bell, supra,* 49 Cal.3d 502, 538.)

The same is true with respect to Cummings's claim that the prosecutor falsely accused defense counsel of coercing testimony and suborning perjury in cross-examining Oscar Martin. There was no objection.[48] An objection would not have been well founded in any case. The prosecutor's statement that "a skillful lawyer, a lawyer that is persuasive as Mr. Rucker is, could maybe get Oscar Martin to say almost anything," was a comment on Oscar's obvious confusion and difficulty in understanding and responding to questions. It reflected on Oscar's lack of recall or comprehension, and cannot reasonably be understood as an assertion that defense counsel sought to elicit perjured testimony from the boy.

An objection was made and the jury was admonished adequately with respect to the prosecutor's argument that Pamela's testimony at trial regarding the reenactment of the murder in the Gays' apartment differed from what she gave at the preliminary hearing. The prosecutor argued that she had done so because Cummings's lawyers had to explain why Cummings would say that he shot Officer Verna. ▌▌▌▌ The court reprimanded counsel on both sides, told them to confine argument to the evidence, not what opposing counsel had done, and told the jury that the arguments of the parties were not implications that any of the attorneys had caused the witnesses to change or fabricate testimony.[49] ▌▌ The prosecutor also told the jury that he was not saying the lawyers had done anything wrong, and then argued the "problem" posed by the evidence that Cummings claimed not to have shot anyone even though there was evidence that in the apartment he said that he had.

Any impropriety and misimpression the earlier argument might have left was cured by the admonition.

---

[48]There was no objection to other instances of purported misconduct. These include: (1) a claim that a rhetorical question asking why, if Cummings was the "innocent man his lawyers claim he is" they had set up Milton Cook, was an assertion that defense counsel believed Cummings was guilty; (2) several statements that "I believe," "I think," and "I am willing to bet" which Cummings asserts offered the prosecutor's personal opinion about Cummings's guilt and vouched for witness testimony; (3) vouching by saying "I realize the significance of it" about testimony of a witness and saying that there was no basis for concluding that various witnesses were not telling the truth; and (4) reference to evidence not presented at trial by speculation as to what defendants might have said.

Notwithstanding the absence of objections, we have reviewed the record and do not accept defendant's characterization of the prosecutor's remarks which Cummings has taken out of context. The argument was directed to the state of the evidence and legitimate inferences that could be drawn from it. The imagined statements by Cummings were no more than sarcastic hyperbole identifying what the prosecutor believed to be weakness in the defense explanation of the events. None of the matters of which Cummings complains rises to the level of misconduct.

[49]When supported by the evidence and inferences drawn therefrom, argument that testimony or a defense is "fabricated" may not, without more, be properly characterized as an attempt to impugn the honesty and integrity of defense counsel. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 237 [253 Cal.Rptr. 55, 763 P.2d 906].)

### F. *Jury Communications—Gay.*

On several occasions during the trial the court passed to counsel notes from the jurors asking questions that had not been answered to the jurors' satisfaction by the evidence. Gay's attorney objected to the practice without stating grounds. He now contends that in at least three of these instances he was prejudiced because the notes were passed on.

After Oscar Martin testified that Gay did not look like the person he had identified at the lineup (No. 4), a juror on Gay's jury submitted a note asking: "Why no one tell Gay to remove his glasses." Over objection by Gay's attorney, the court allowed all counsel to see the note, stating that this was her usual practice and that it was within the discretion of counsel to decide whether the question should be asked. At the request of Cummings's counsel, Gay was asked to stand and remove his glasses. Oscar then testified that he looked like the man designated number 4 in the lineup.

After Cummings's expert testified regarding gunshot residue tests he had performed on the automobile in which defendants were riding when Officer Verna was shot, a member of Cummings's jury asked whether barium and antimony were found. On redirect, Cummings's counsel asked the question and the witness answered that those elements were not found combined with the lead.

Prior to the jury participation in the demonstration with the automobile a member of the Cummings jury asked if it was necessary to "unlatch" the driver's seat to let a person in the rear seat get out. After the unreported demonstration, counsel for Cummings asked that the record reflect that there was no latch, the seat could be pushed forward, and would return to its erect position by itself. He also sought a stipulation from the prosecutor that there was no latch, but the prosecutor declined.

As is apparent from the questions, none was improper. The evidence sought by the jurors was highly relevant. It could have been offered by the prosecution or elicited in questions by the judge. Gay was "prejudiced" only because additional evidence relevant to his guilt was admitted when counsel for Cummings elected to elicit or present the evidence sought by the jurors.

Gay argues, however, that the jurors were permitted to depart from their role as neutral fact finders and detached observers. In his view, jurors are to be passive recipients of the evidence the advocates consider essential to the truth-finding process. He suggests that permitting the inquiries also some- how violated the jurors' obligation not to discuss the case among themselves

before the case is submitted to them for decision (§ 1122) and that permitting counsel to see the notes violated counsel's ethical duty not to communicate with jurors during trial. (Rules Prof. Conduct, rule 5-320.)

Gay also argues, that assuming questions from the jurors are permitted, the judge should first review them and then, out of the presence of the jury, consider objections. Only after doing so should the question be asked, and then by the judge only. The procedure followed here, Gay argues, permitted the attorneys to "curry favor" with individual jurors. Since only Cummings's counsel responded to inquiries, Gay was prejudiced by the appearance that Cummings's counsel were more trustworthy.

Gay's perception that only the parties may determine whether evidence is essential to the truth-finding process is misguided. To the contrary, Evidence Code section 775 expressly authorizes the court to call witnesses, preserving the right of the parties to object and cross-examine in order to ensure that the truth is exposed. The court may do so over the objection and against the will of the parties in furtherance of justice, although the power to do so must be exercised impartially. (*McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 533 [116 Cal.Rptr. 260, 526 P.2d 268]; *Roth* v. *Moeller* (1921) 185 Cal. 415, 420-421 [197 P. 62]; *Marin Water etc. Co.* v. *Railroad Com.* (1916) 171 Cal. 706, 714 [154 P. 864]. "A trial judge may examine witnesses to elicit or clarify testimony. [Citations.] Indeed, 'it is the right and duty of a judge to conduct a trial in such a manner that the truth will be established in accordance with the rules of evidence.' [Citation.] The trial judge, however, must not become an advocate for either party or under the guide [*sic*] of examining witnesses comment on the evidence or cast aspersions or ridicule on a witness." (*People* v. *Rigney* (1961) 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186].)

 For the same reason, the judge has discretion to ask questions submitted by jurors or to pass those questions on and leave to the discretion of counsel whether to ask the questions. Although the issue has rarely arisen in California, the Court of Appeal has concluded that questions by jurors may be asked by the court. In *People* v. *McAlister* (1985) 167 Cal.App.3d 633, 644 [213 Cal.Rptr. 271], the court addressed, and disapproved, a procedure of direct questioning by jurors, but recognized that submitting written questions for consideration by the court and counsel before submission to the jury is proper. (See *People* v. *Gates* (1979) 97 Cal.App.3d Supp. 10 [158 Cal.Rptr. 759].) We agree with the Court of Appeal that this practice of direct jury questioning of witnesses should not be permitted. The danger of irrelevant and improper questions is high, and were counsel to object, the potential for prejudice is apparent. Submitting the questions to counsel for consideration and permitting counsel to ask the questions avoids this danger.

There is no merit to Gay's claim that the court did not exercise control over the procedure. The record confirms that the judge reviewed the questions first and exercised her discretion to pass the question on to counsel, leaving to them the decision whether to ask the questions. Nothing in the record suggests that the jurors who submitted the questions had discussed them with other jurors. The receipt, through the court, of juror questions regarding the evidence during trial is not a communication with a juror which is proscribed by the Rules of Professional Conduct. (*Id.*, rule 5-320(H).) There is no foundation for the claim that this constitutes unethical conduct.

### G. *Adjournment—Gay.*

 In an argument relevant to both the murder and robbbery counts, Gay argues that the court erred in adjourning his trial for eight days following the close of evidence.

His attorney did not object to the adjournment, however, and the record indicates that it had been discussed earlier. While the court did not explain the necessity for the adjournment, which was actually only three regular trial days, it is apparent from the record that the brief adjournment of the Gay trial was necessary to accommodate proceedings incidental to the submission of the case to the Cummings jury. There was neither error nor abuse of discretion.

## V.

### GUILT PHASE ERROR—ROBBERY-RELATED COUNTS

Gay challenges his conviction of the counts charging him with robbery, attempted robbery, and conspiracy to commit robbery. We conclude that reversal of the robbery-related counts is required because the trial court failed to instruct on the elements of robbery, other than the intent to permanently deprive the owner of property which was explained in general instructions on specific intent. It is nonetheless necessary to set out the evidence connecting Gay with the robberies and to address his other claims since he argues that errors during trial on the robbery counts and incompetence of trial counsel in relation to those counts prejudicially affected the murder and penalty verdicts.

### A. *The Evidence.*

The jury found Gay guilty on two counts of attempted robbery, ten counts of robbery, and one count charging conspiracy to commit robbery. The robberies and attempted robberies involved seven separate incidents.

1. *Kenn Cleaners—counts I, II, and III.*

One victim of this robbery identified Cummings as one of the two perpetrators. None of the three victims was able to identify the second robber.Pamela, who drove the getaway car, testified that Gay was that person and had admitted striking one victim. Her testimony was corroborated in part by the testimony of two young men, but neither of them identified either of the perpetrators.

On April 25, 1983, about 7:45 p.m., the Granada Hills dry cleaning business owned by Hagop Parunyan was closed. He and Lisa Pina, an employee, were inside the shop. His brother-in-law, Sahan Somunjian, was outside the back door. Somunjian testified that a man whom Somunjian did not see put a gun to the back of his head and asked where the safe and the money were. When Somunjian said he did not know and that his wallet was in his car, the man dragged Somunjian, who was then lying down, to the car and took Somunjian's wallet and keys. The man then hit Somunjian several times on the back of the head. The beating broke one of Somunjian's fingers, made a "hole" in his head, and left scars.

Parunyan testified that while this man was hitting Somunjian, a Black man, who was not Gay, entered the shop and ordered Parunyan to lie down on his face and hit him twice with a handgun on the back of his neck. He then took Pina to the front of the shop, after which he returned, put Pina down on top of him and ordered him not to raise his head.

Pina testified that she was standing by the open back door of the shop when two men ran up. One, a Black man whom she identified as Cummings, asked if they had a safe. He then saw Somunjian who he ordered to lie down. He took Pina to the cash register from which he took the money. She saw him striking Somunjian.

Todd Husk and Troy Gann were in an alley behind the cleaning shop. Todd observed a dark blue or green car behind the shop. A woman was in the car. He also saw two men, one of who "popped" around the corner when the automobile horn honked. He had identified one of those men as Cummings. Troy also saw the car and saw two men "sneaking" around. One peeked around the corner. Another was bending over behind a trash can. He had identified one man as Cummings. He heard the horn on the car honk, after which both men got into the car which then turned and drove down the alley where it turned again and went back to where it had been. Troy identified a photo of the car. The photo depicted Robin's car.

Pamela testified that she, Cummings, and Gay drove to the Kenn Cleaners and parked against a wall about 10 or 15 feet from the back of the shop. She

remained in the car while the two men got out, walked closer to the cleaners and looked to see who was there. While she was waiting two "young kids" walked through the alley. She honked the horn at that time. Cummings and Gay went into the cleaners where they remained about 10 minutes. When they returned and got into the car, Cummings divided about $300, and he said that two men in the shop had been told to lie down and he had taken a girl to the cash register to get the money.[50] Gay said that he had hit a man over the head.

2. *Salads Plus—counts IV and V.*

Neither of the two victims of this robbery identified the two Black perpetrators. Pamela testified that after she entered the shop to see who was present, Cummings and Gay committed the robbery while she and Robin waited outside in Gay's car.

Abdul Shamji testified that on May 6, 1983, about 8:10 p.m. he was in his restaurant, a salad bar, with his brother Madatali. The restaurant was closed. Two Black men entered the unlocked back door. One told him to open the cash register and took about $200 from the drawer when he complied. The man then told Shamji to open the safe and took about $1,200 and some jewelry from the safe. This victim was then told to lie down in the kitchen and was hit several times on the head with a gun. His finger was broken and he suffered a head injury. A shot was fired into the door.

Madatali Shamji testified that he was told to put his hands on his head and lie on the floor. One of the robbers sat on him and held a gun to his head. The man struck him on the head with the gun inflicting several cuts and bruises.

Pamela testified that she, Robin, Cummings, and Gay had driven to a Baskin-Robbins shop about five doors from the Salads Plus restaurant in Robin's car. After watching the Baskin-Robbins shop, which had many people passing and had large windows, for about two hours, they turned their attention to the restaurant. Pamela went in by the back door, learned that it was closed, and returned to the car. Cummings and Gay then went in and remained about 10 minutes. Pamela heard a shot while they were inside. They returned to the car and drove to Robin's apartment. Cummings said that the gun had gone off accidentally and that when he forced the man to open the safe the man gave him money and jewelry.

[50]Pamela's testimony regarding Cummings's statements about this and the other robberies was admitted over objection by Gay's attorney.

### 3. *Repair shop—count VI.*

Gay was identified by the victim of this robbery who was deceased at the time of trial. His preliminary hearing testimony was read. In that testimony Richard Hallberg said that on May 13, 1983, about 8:55 p.m. he was in his recreational vehicle repair shop in Reseda. The shop was closed. Two men, one Black and the other "possibly" Black, entered. Gay told Hallberg to give him the money. Hallberg said he did not have it there and started toward the cash register. Gay asked where he was going and when Hallberg said he was going to where the money was, Gay began to hit him over the head with a revolver. The other man also hit him on the head with a revolver. Hallberg was hit about 15 times, suffered 13 cuts, and the area of his right eye and his left ear were split open. His nails were bruised. Two hundred dollars was taken from the register, $1,300 from Hallberg's pocket, $100 was taken from his wallet, and a knife and belt buckle were taken.

A metal revolver part was later found in the place where Hallberg was beaten. The knife taken in the robbery was found in the pocket of the jacket worn by Gay at the time of his arrest.

Pamela testified that she, Cummings, and Gay drove in Robin's car to the repair shop. She parked about 15 to 20 feet away. Cummings and Gay left the car and returned after about 10 minutes. Later, at Robin's apartment, Gay said that he had hit the man over the head with a gun and the gun broke. She saw about $1,000 which was divided in half.

### 4. *Designer Florist—count VII.*

Carmen Rodriguez, the victim of this robbery, could not identify Gay in court, and testified that he was not there. She also testified, however, that "Kenneth Gay" had attempted to rob her in her flower shop, Designer Florist, on May 20, 1983, about 9:45 a.m. She described him as a light-skinned Black man with loose curly hair. She had identified Cummings as the other man in a police photo lineup and during a grand jury hearing.[51] When she had seen Gay on television he looked totally different than the day of the attempted robbery. His hair was different. He had shaved off his moustache, and he was bruised. She testified that in her report to the police she had described him as a light-skinned Black man with loose curly hair and a moustache.

Rodriguez testified that Gay and Cummings entered the Chatsworth shop about 9:45 a.m. on May 20, 1983, while her back was turned. Cummings

---

[51]The witness testified during an Evidence Code section 405 hearing that she knew Gay's name because she had clipped pictures of the two defendants and news articles about them which she kept in her files.

pointed a knife at her waist, threatened to kill her if she screamed, and dragged her to the office where he demanded that she open the safe. Gay hit her over the head with a gun as she did so. When she had difficulty opening the safe, Gay told Cummings to shoot her. She opened the safe which held no money, after which the men grabbed her and told her to get on the floor. Gay beat her over the head with the gun.

A nearby merchant testified that he observed the car and identified Pamela as the woman in it. He also identified a photo of the car. The car was a green Plymouth that belonged to Robin.

Pamela testified that she drove Cummings and Gay to the shop, parked in the back, and went into the shop. She returned and told her companions what she saw, after which Cummings and Gay went in. They returned after about 10 minutes. Cummings said that when the lady didn't open the safe Gay hit her over the head with the gun. Pamela saw blood on both Cummings's and Gay's clothes. It had not been there before.

Pamela testified that Gay had said he was hesitant about committing a robbery in the shopping complex in which the florist shop was located because his mother worked in a nearby drugstore. Pamela was familiar with the drugstore which was about 500 feet from the florist shop. It was possible to see the florist shop from the drugstore.

5. *Artistic Bath—counts VIII and IX.*

Corey Glick testified that Gay could be one of the two men who robbed him and his mother, Joyce Glick, in their Ventura Boulevard "Artistic Bath" shop about 5 p.m. on May 31, 1983, just as they were closing. About one-half hour earlier two women had come in, looked around the bath salt area and left. He identified a photo of Pamela as one of the women.

The man who could have been Gay tapped on the door and said that he needed bath salts for his wife. Glick admitted him, showed him the bath salts, and went to turn on the lights. As he did so Gay pulled a gun on Glick's mother and ordered her to the back of the store. A second man, holding a knife, entered and told Glick to get down on the floor, threatening to slit Glick's throat. The man then took Glick's eyeglasses and asked where the safe was. When Glick told him that his mother's purse was the safe, the man took about $500 and a ring from the purse and took Glick's keys.

Joyce Glick testified that the first man who entered was very light complected. She thought he was White.

Pamela testified that she, Robin, Cummings and Gay went to the bath shop in Robin's car. They looked around and reported back to the two men who then went into the back door of the bath shop. The men remained about 10 minutes. They were walking fast when they returned. Gay ripped off his shirt. Cummings said he held a knife to the man's throat. Gay said he had held a gun on the lady. Pamela saw about $300 and a ring. Pamela divided the money in half and gave half to Gay. She kept the ring which was identified by Joyce Glick as the one taken in the robbery.

### 6. *Pizza Man—counts XII, XIII and XIV.*

Bruce Anderson, manager of the Pizza Man delivery service in Sylmar, testified that he and two employees, Mark Litke and Casey Graham, were in that shop about 7:30 p.m. on May 29, 1983, when Cummings entered with a gun. Cummings said he wanted the money. All three gave Cummings the money in their wallets.

Pamela testified that shortly after May 29, 1983, Cummings told her that he and Gay had robbed a pizza shop. Gay was present when Cummings said this.

### B. *Instructions.*

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The fear may be: "1. The fear of an unlawful injury to the person or property of the person robbed, or of any relative of his or member of his family; or [¶] 2. The fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery." (§ 212.)

■ The trial court must instruct even without request on the general principles of law relevant to and governing the case. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].) That obligation includes instructions on all of the elements of a charged offense. (*People* v. *Dyer* (1988) 45 Cal.3d 26, 60 [246 Cal.Rptr. 209, 753 P.2d 1].)

Neither Gay nor the People submitted robbery instructions to the court, and the court did not include an instruction defining robbery when instructing the jury. The court did instruct the jury, however, that ". . . the crime of

attempted robbery . . . requires the specific intent to permanently deprive the owner of its property."[52]

Gay contends that the failure of the court to instruct on four of the five elements of robbery,[53] is federal constitutional error that is reversible per se.[54]

The People concede that the omission of the instruction was error, but contend that it was harmless because the evidence established that all of the robberies were accomplished at gunpoint and the jury was instructed on the intent to permanently deprive. In addition, Gay did not dispute that the offenses shown by the evidence were robbery, challenging only the identification of himself as one of the robbers. Therefore, they argue, the harmless error analysis followed in *People* v. *Dyer, supra,* 45 Cal.3d 26, 63, and *People* v. *Odle, supra,* 45 Cal.3d 386, 410-416, should be applied here even though the jury was not instructed that to convict, it must find that personal property was taken from the robbery victims against their will by means of force or fear, and that it was not instructed on these elements with regard to the attempted robbery and conspiracy counts.

*Odle* and *Dyer* are not authority for affirmance when the trial court's instructions fail to advise the jury of the elements of a charged offense. In

[52]The instruction was among those given to advise the jury which of the charged offenses require specific rather than general criminal intent, and advised: "[T]he crime [*sic*] of attempted robbery and robbery requires [*sic*] the specific intent to permanently deprive the owner of its property."

The prosecutor also told the jury during closing argument that ". . . to have a robbery, you have to take personal property."

The information included allegations that Gay had taken or attempted to take "by means of force and fear . . . personal property from the person, possession and immediate presence" of the named victims. It was not read to the jury, however.

[53]CALJIC No. 9.40, the instruction most often given, defines the crime and separately defines the elements: "Every person who takes personal property in the possession of another, against the will and from the person or immediate presence of that person, accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property, is guilty of the crime of robbery in violation of Penal Code Section 211.

"In order to prove such crime, each of the following elements must be proved:

"1. A person had possession of property of some value however slight,

"2. Such property was taken from such person or from [his][her] immediate presence,

"3. Such property was taken against the will of such person,

"4. The taking was accomplished either by force, violence, fear or intimidation, and,

"5. Such property was taken with the specific intent permanently to deprive such person of the property."

[54]Error in omitting an element of an offense in jury instructions is subject to harmless error analysis when considering the defendant's state constitutional due process right to have the jury determine every material issue presented by the evidence. (*People* v. *Odle, supra,* 45 Cal.3d 386, 415; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 765 [175 Cal.Rptr. 738, 631 P.2d 446].)

*Odle*, the trial court had omitted instructions on the elements of the special circumstance of intentionally killing a peace officer engaged in the performance of his duty (§ 190.2, subd. (a)(7)) alleged in conjunction with a murder charge. We were persuaded that the standard of review to be applied to that error was not the reversible per se rule subject only to the exceptions recognized in *People* v. *Sedeno, supra*, 10 Cal.3d 703 and *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], the *"Cantrell-Thornton"* exception (*People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267]). The error could instead be tested under the harmless error analysis of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*People* v. *Odle, supra*, 45 Cal.3d 386, 410-414.)

Our conclusion was based in part on the unique status of a special circumstance allegation. Although by statute in California the special circumstances which make a defendant eligible for the death penalty are to be charged in the information and found by the jury, there is no constitutional right to a jury trial on that issue which, but for the statutory mandate, would be a sentencing issue. (*People* v. *Odle, supra*, 45 Cal.3d 386, 411-412.)

We also recognized, however, that as to elements of the offense the United States Supreme Court had recently held in *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101], reversal is mandated if instructional error on the elements of a crime, whether an impermissible presumption or omission of an element, "necessarily rendered the trial fundamentally unfair, if it aborted the basic trial process or denied it altogether . . . ." (*People* v. *Odle, supra*, 45 Cal.3d 386, 413.) In *Rose* v. *Clark, supra*, 478 U.S. 570, where the jury had been given an instruction creating a rebuttable presumption of malice in all homicides, the Supreme Court suggested that a trial would not be fundamentally unfair or the basic trial process aborted if "the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause injury. [Citation.] In that event the erroneous instruction is simply superfluous: the jury has found . . . 'every fact necessary' to establish every element of the offense beyond a reasonable doubt." (*Id.*, at pp. 580-581 [92 L.Ed.2d at p. 472].)

That cannot be said in this case. A finding that property was taken with the intent to permanently deprive the owner does not compel a conclusion that the jury has found the facts necessary to establish the remaining elements of the offense.

The Supreme Court extended the reasoning of *Rose* v. *Clark, supra*, 478 U.S. 570, to instructions which withdraw part of an element of a crime from

jury consideration in *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918]. There, in an obscenity prosecution based on the sale of magazines, the jury had been instructed erroneously that the value of the material, i.e., whether it had serious literary, artistic, or political value, was to be determined by community standards. As a result, the jury was not required to find whether a reasonable person would find that the material, taken as a whole, has such value. The high court analogized the error to that in *Rose* v. *Clark, supra*, 478 U.S. 570, noting that the jury was not precluded from considering the question of value altogether. The court held that in those circumstances the convictions could be upheld if the reviewing court concluded "that no rational juror, if properly instructed, could find value in the magazines." (481 U.S. at 503 [95 L.Ed.2d at p. 447].)

*People* v. *Dyer, supra*, 45 Cal.3d 26, on which the People also rely, does not aid them. There, too, only one aspect of the intent element of the definition of aiding and abetting had been omitted from the court's instructions. That error was subject to review under the harmless error analysis of *Rose* v. *Clark, supra*, 478 U.S. 570. We noted in so doing that the error was not equivalent to a directed verdict and was not an error that wholly prevented the jury from considering the issue. (45 Cal.3d at p. 63.)

More recently in *Carella* v. *California* (1989) 491 U.S. 263 [105 L.Ed.2d 218, 109 S.Ct. 2419], *Sandstrom* error (*Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450]) had occurred when two mandatory presumptions were included in jury instructions on grand theft—one creating a presumption of intent to commit theft by fraud and the other creating a presumption that a person who willfully and intentionally failed to return a leased or rented vehicle within five days of the expiration of the lease or rental agreement embezzled it. The Supreme Court rejected the argument of the People, one similar to that made here, that because the defendant had not disputed the presumed facts the error was harmless.

The court reasoned that the error in creating the mandatory presumptions relieved the People of their burden of proving every element of the offense beyond a reasonable doubt and thereby denied the defendant his due process rights, subverted the presumption of innocence, and "invade[d] the truth-finding task assigned solely to juries in criminal cases." (*Carella* v. *California, supra*, 491 U.S. at p. 265 [105 L.Ed.2d at p. 221].) Noting that it had held that *Sandstrom* error was subject to the harmless error test in *Rose* v. *Clark, supra*, 478 U.S. 570, the court held that the judgment could be upheld only if "no rational jury could find the predicate facts but fail to find the fact presumed." (*Carella* v. *California, supra*, 491 U.S. 263, 267 [105 L.Ed.2d 218, 222-223]; see also, *Yates* v. *Evatt* (1991) 500 U.S. __ [114 L.Ed.2d 432, 448-449, 111 S.Ct. 1884].)

These decisions make a clear distinction between instructional error that entirely precludes jury consideration of an element of an offense and that which affects only an aspect of an element. Moreover, none suggests that a harmless error analysis may be applied to instructional error which withdraws from jury consideration substantially all of the elements of an offense and did not require by other instructions that the jury find the existence of the facts necessary to a conclusion that the omitted element had been proved.

Therefore, regardless of the merits of the People's argument that Gay did not dispute the existence of the predicate facts and that the evidence overwhelmingly established all of the elements of robbery, attempted robbery, and conspiracy to commit robbery, the conviction of Gay on counts I, II, III, IV, V, VI, VII, VIII, IX, XII, XIII, XIV, and XVI, must be reversed.

### C. Admission of Taped Statement.

Gay was tried on the robbery-related counts, before his jury only, prior to the joint trial on the murder count. Before the introduction of any evidence an extensive hearing was conducted pursuant to Evidence Code section 405 to determine the admissibility of statements made by Gay during a pretrial interview with the prosecutor, his investigator Jack Holder, and John Helvin, a police detective who at that time was also assigned to investigate the death of Officer Verna. Gay objected to admission of his statements on grounds that the statements, which included admissions and confessions, were made during plea negotiations and thus were involuntary. He also objected that the prosecutor had not advised the defense of an intent to use the statements.

The trial court denied the motion to exclude the statements. Gay renews the arguments made in the trial court in support of a claim that the trial court erred and also argues that trial counsel was incompetent in recommending that he make the statement. Because Gay attacks counsel's competence on additional grounds that relate to other stages of the proceedings, we treat the ineffective counsel claim separately in the concluding section of the opinion.

The evidence relevant to admissibility of Gay's statement must be set out at some length because it is also relevant to Gay's claim that the court improperly denied his motion to relieve counsel and represent himself and his claim that counsel afforded constitutionally inadequate representation.

Daye Shinn, who had been retained by Gay and was later appointed to represent him, sought to arrange for a polygraph examination of Gay to be administered by the People's expert examiner. He hoped, if Gay passed the examination, to arrange to have Gay testify as a prosecution witness. Gay

had asserted his innocence of all charges at that time. Shinn contacted the prosecutor to say that Gay wanted to take a polygraph examination. The prosecutor said he would consider the proposal only after speaking to Gay and only if he believed Gay was truthful. If he did, Gay would be permitted to undergo a polygraph examination. A plea bargain would be arranged only if Gay also "passed" that examination. The prosecutor assumed that Gay was going to deny everything. He could not understand why Gay would agree to the interview otherwise.

At the outset of the taped interview Officer Helvin advised Gay of his constitutional rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), all of which other than the right to counsel he waived. Gay was expressly advised that anything he said during the interview could and would be used against him at trial. The prosecutor preceded his questioning with an admonition that "nothing has been promised to you in any way shape or form, a promise hinted at or anything else, in order to . . . convince you to take this examination or to convince you to . . . participate in this interview. Isn't that right?" Gay replied, "That's right."

Shinn was asked whether all of the agreements under which Gay was making his statement had been placed on the record on the tape. Shinn added nothing and said they should go ahead. Shinn asserted during the Evidence Code section 405 hearing that Gay had made the statement with the understanding that the tape would not be used if he were not allowed to testify for the prosecution. Helvin testified that no such agreement had been reached. The prosecutor testified that there was no agreement with Shinn.

Shinn testified that he believed that only a polygraph examination was contemplated and was surprised to see a tape recording machine in the interview room. He acknowledged that the prosecutor told him that questions would be asked first, but Shinn maintained that he believed that Gay's statements would not be used if Gay was not given a polygraph examination or used as a witness for the People. He did not respond to the prosecutor's cross-examination asking where the "understanding" came from other than to say the question was ambiguous. Shinn then resumed his direct testimony and said that he had told Gay that the statements would not be used and Gay made his statement only on that representation.

Gay testified that nothing was said to him by Shinn about the use of his statements if he was not given a polygraph examination. It was his impression from the prosecutor that if the prosecutor believed he was not truthful he would be sent back to jail. It was also his impression that the tape would

not be used. He thought, even after Helvin told him the statement would be used, that the tape would not be used because he would end up being a state's witness. He had no knowledge of an agreement between the prosecutor and Shinn.

The trial court found that neither Gay nor Shinn had been "lulled" into making the statement and the statement was voluntary.

Gay resumed the stand at that point and testified that Shinn had advised him to "cop out" to the robberies because the polygraph examination would show that he was lying. He and Shinn plotted to trick the prosecutor into allowing him to take the polygraph examination. At the time of the hearing he felt that he had been tricked by Shinn. He did not feel he had been tricked by the prosecutor.

Shinn was then called by the prosecutor and asked if he had heard Gay's testimony. Shinn testified that he did not recall either Gay's testimony or his own past conversation with Gay, but he had never told anyone to lie.

The court again found the statements to be voluntary.[55] Gay claims that the court erred because the statement was made on the advice of his own attorney, and it was made in the course of plea negotiations.[56] The claim lacks merit. There was no coercion or coercive police activity, and he was advised of his right against self-incrimination, was advised that the statement would be used against him, understood his rights, and voluntarily waived them. Therefore, the statement was not involuntary (*Colorado* v. *Connolly* (1986) 479 U.S. 157, 167 [93 L.Ed.2d 473, 484-485, 107 S.Ct. 515]; *People* v. *Clark*, *supra*, 50 Cal.3d 583, 620, fn. 30) and was not taken in violation of his rights under the Fifth, Sixth, and/or Fourteenth Amendments of the federal Constitution, or under their California constitutional counterparts.

---

[55]Shinn also argued at this point that he had no prior knowledge that the tape would be offered. The court found that he was aware of its existence, that the prosecutor's files were made open to him, that a copy of the tape would have been supplied to him at any time had he requested it, and that nothing the prosecutor had done prevented Gay from having access to the tape. To the extent the motion was based on denial of discovery, the motion to exclude the tape was denied.

The People subsequently produced a receipt confirming that Shinn had acknowledged receipt of a copy of the tape.

The claim that the court erred in ruling on this aspect of the motion lacks merit.

[56]Evidence Code section 1153 states: "Evidence of a plea of guilty, later withdrawn, or of an offer to plead guilty to the crime charged or to any other crime, made by the defendant in a criminal action is inadmissible in any action or in any proceeding of any nature, including proceedings before agencies, commission, boards, and tribunals."

(Cal. Const., art. I, § 15.)[57] That conclusion is not affected by the fact that Gay's own attorney advised him to admit his complicity in the robberies.

The statement was not made in the course of plea negotiations, but as a precondition to initiation of any discussion of disposition of the charges.[58] If there was any doubt as to that nature of the interview the express advice that the statement would be used against Gay was adequate to warn him and his attorney that the prosecutor intended to use Gay's statement at trial.[59]

We reject, for the same reasons, Gay's claim that the prosecutor should be estopped from introducing his statement, and we find no merit in his claim that the trial court improperly shifted the burden of proof on the question of voluntariness to him. The latter claim is based on a comment made by the court prior to the presentation of evidence by the People that it had not found any testimony to show that Shinn or Gay had been "lulled" into confessing. The People presented ample evidence of voluntariness after that remark.

### D. *Self-representation.*

Before the court's third finding of voluntariness and ultimate denial of the motion to exclude Gay's taped statement, Shinn stated that he would have to confer with his client and that a conflict then existed between him and his client. After the motion was denied, Gay stated: "Your honor, in light of that ruling, I feel that Mr. Shinn has not adequately represented me, and I would thereby relinquish [*sic*] him of the responsibility at this time and take over the case myself, and I will need time to prepare." The court denied the motion, but on the next court date held a *"Marsden"* hearing

---

[57]Although the court ruled that the question of voluntariness would also be put to the jury, when the tape was played for the jury, Gay offered no evidence regarding the circumstances in which his statement was made.

[58]We note also that Shinn had told the prosecutor only that Gay wanted to take a polygraph and at that time continued to claim that he was innocent of all charges. Shinn's purpose in seeking the interview according to both Shinn and Gay was to convince the prosecutor that Gay was truthful in denying complicity. This purpose cannot be characterized as a plea negotiation.

[59]This advice serves to distinguish this interview from those at issue in the federal cases on which Gay relies for his argument that the statement was made during inadmissible plea negotiations. (See *United States* v. *Robertson* (5th Cir. 1978) 582 F.2d 1356; *United States* v. *Grant* (8th Cir. 1980) 622 F.2d 308, 312 [60 A.L.R.Fed. 840]; *United States* v. *Washington* (E.D.Pa. 1985) 614 F.Supp. 144, 148-149.)

Our conclusion that the statement was not made in the course of plea negotiations and was admissible makes it unnecessary to discuss the People's argument that the addition of section 28 subdivision (d), the "Truth in Evidence" provision, to article I, of the California Constitution repealed the statutory bars to admission of statements made during plea negotiations. (See §§ 1192.4, 1192.5, and Evid. Code, § 1153.)

(*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]) at which Gay further explained the reasons for his request.[60]

At that hearing Gay stated that the revelations regarding the circumstances of Shinn's advice to admit the robbery-related charges led Gay to believe that Shinn had not acted in Gay's best interest. Gay said that although it had not been determined whether the prosecutor deceived Shinn, or the opposite, he, Gay, bore the consequences and to protect himself it was necessary to eliminate any party to the deception. Gay again expressed a need for additional time to prepare, and he asked that the jury be "disbanded" so that he could conduct voir dire.

In further support of his motion Gay stated that he had been denied the right to participate in his defense since he was unaware of any negotiations and that if Shinn had engaged in the private negotiations he claimed, Shinn had deceived Gay regarding them.[61]

The court denied the motion citing *People* v. *Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187] and *People* v. *Spencer* (1984) 153 Cal.App.3d 931 [200 Cal.Rptr. 693], thereby finding that the motion was untimely. The court also explained that although Shinn had represented Gay for over a year, the case had been underway for over four months, forty motions had been disposed of, there had been no prior claim that a conflict existed or motion for self-representation. Shinn's representation had been

---

[60]Although dissatisfaction with counsel was the basis for Gay's motion, he did not seek appointment of different counsel. The court was not obliged to ask if he desired appointment of different counsel or to treat the request as one made pursuant to *People* v. *Marsden, supra,* 2 Cal.3d 118. (*People* v. *Frierson* (1991) 53 Cal.3d 730, 741 [280 Cal.Rptr. 440, 808 P.2d 1197].)

The court's reference to a possible conflict between attorney and client suggests that Shinn's mention of conflict persuaded the court that a *Marsden* hearing should be held in addition to consideration of Gay's request for self-representation.

[61]As additional support for his assertion that he was receiving ineffective representation he noted that Shinn had not objected to a proposal to tell the jury that it should not be concerned why the (then deceased) robbery victim Hallberg was not present. Photos of Hallberg, who had been pistol whipped during the robbery, had been displayed to the jury. Gay argued that the jury would necessarily conclude that the reason for Hallberg's absence was that he died from the pistol whipping. Shinn had also failed to object to a visual demonstration of the prosecutor's theory that a gun had been passed in the car.

The prosecutor advised the jury during his opening statement that Hallberg was unavailable, but ". . . we are not blaming Mr. Gay for him being unavailable. He just isn't. That happens with the passage of time."

proper and no conflict that would preclude continued representation had been demonstrated.[62]

 Gay contends now that his motion to dismiss counsel was timely, that even if the motion was untimely the court abused its discretion in failing to consider all factors relevant to a decision, and that as a result he was denied his Sixth Amendment right of self-representation.

 A defendant who is competent to understand the dangers of self-representation and voluntarily waives his right to representation by counsel has a right guaranteed by the Sixth Amendment to represent himself. (*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]; *People v. Joseph* (1983) 34 Cal.3d 936, 943 [196 Cal.Rptr. 339, 671 P.2d 843].) The defendant must, however, invoke that right within a reasonable time prior to the commencement of trial. (*People v. Windham, supra*, 19 Cal.3d 121.)

When a request is made after the commencement of trial, granting such a request is a matter committed to the sound discretion of the trial court. (*People v. Frierson, supra*, 53 Cal.3d 730, 742; *People v. Burton* (1989) 48 Cal.3d 843, 854 [258 Cal.Rptr. 184, 771 P.2d 1270].) In the exercise of its discretion the court must consider "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion. Having established a record based on such relevant considerations, the court should then exercise its discretion and rule on the defendant's request." (*People v. Windham, supra*, 19 Cal.3d 121, 127-129; see also *People v. Hamilton* (1988) 45 Cal.3d 351, 368-369 [247 Cal.Rptr. 31, 753 P.2d 1109].)

 Gay's motion was not timely. It may be true, as Gay now argues, that the motion was made as soon as he became aware of Shinn's "deception." Timeliness under *People v. Windham, supra*, 19 Cal.3d 121, is measured with respect to the time trial commences, however. (*People v. Burton, supra*, 48 Cal.3d 843, 853; cf. *People v. Fierro* (1991) 1 Cal.4th 173, 204-205 [3 Cal.Rptr.2d 426, 821 P.2d 1302]; *People v. Marsden, supra*, 2 Cal.3d 118.) Although no evidence had been presented when Gay made his motion, the trial had commenced. Jury selection had commenced more than four months earlier and Gay's jury had been sworn. Pretrial motions had

---

[62]The judge denied a request by the People for findings that might have resolved whether Gay sought the polygraph examination intending to deceive the prosecutor and whether Gay's assertion that Shinn advised him to lie was credible. The court ruled that such findings would be premature since the voluntariness of Gay's confessions was also to be a jury question.

been heard and disposed of. Gay was not ready to proceed and stated that if his request were granted a continuance would be necessary. Since the motion was not timely, it was addressed to the discretion of the trial court.

Clearly the court did consider the relevant factors and did not abuse its discretion in denying the motion. Delaying trial would have necessitated discharge of the jury. Jury selection had been prolonged and difficult because of the projected length of the trial and because of the capital charge. The Cummings's jury had also been selected and a joint trial was to be held on that charge. The court had the opportunity to observe the quality of Shinn's representation over several months. The evidence at the hearing did not compel a conclusion that his overall representation was incompetent. The *Windham* factors weighed heavily against granting Gay's motion which was conditioned on granting a continuance.

### E. *Admission of Evidence.*

 Gay next contends that, over his hearsay and relevance objections, the trial court erroneously admitted evidence of Cummings's guilty pleas and the conviction of Robin when evidence was presented on the robbery-related charges. Because we have determined that the robbery-related counts must be reversed, we address the question of admissibility of the evidence only to give guidance to the trial court in the event that those counts are retried.

For the reasons discussed earlier, we agree that evidence of Robin's conviction was inadmissible at this phase of the trial also. ██ ██ Evidence of a guilty plea is distinguishable, however, since a guilty plea falls within the hearsay rule exception for declarations against penal interest. (Evid. Code, § 1230.)[63]

 Gay argues that if Cummings's pleas were relevant they were so because they necessarily implicated him in the robberies. Therefore, he reasons, evidence of those extrajudicial statements may be admitted only if the declarant is available for purposes of confrontation and cross-examination as guaranteed by the Sixth Amendment. (*Bruton* v. *United States, supra,* 391 U.S. 123; *People* v. *Aranda, supra,* 63 Cal.2d 518.) If, as the People suggested, Cummings's guilty pleas imply that Gay, too, participated in the robbery-related offenses, there is merit in that argument.

---

[63]Since these guilty pleas are not those of Gay himself and were not in furtherance of the then-completed conspiracy, they are not within the exceptions for statements of a party (Evid. Code, § 1220) or conspirator. (Evid. Code, § 1223; *People* v. *Leach* (1975) 15 Cal.3d 419 [124 Cal.Rptr. 752, 541 P.2d 296].)

The trial court ruled that evidence of Cummings's guilty pleas was admissible because it corroborated Pamela's testimony regarding the robberies and the conspiracy. It did so only insofar as she had testified that Cummings participated in those offenses, however. It does not corroborate her testimony that Gay was a participant unless one infers that Gay was Cummings's crime partner in all of the robberies committed by Cummings. Any probative value attached to that inference is clearly outweighed by the prejudicial impact of the evidence. (Cf. *People* v. *Leonard* (1983) 34 Cal.3d 183, 188 [193 Cal.Rptr. 171, 666 P.2d 28].)

The People argue that the evidence was also admissible because Pamela's credibility was in issue. Again we disagree. Evidence of a codefendant's guilty pleas which is more prejudicial than probative when offered to raise an inference of the defendant's guilt is per se more prejudicial than probative when offered simply to bolster the credibility of another witness.

The People also argue that because the guilty pleas fall within an exception to the hearsay rule there is no confrontation clause problem. *People* v. *Morales, supra,* 48 Cal.3d 527, 552, on which they rely does not create a blanket exception to the right of confrontation and cross-examination for all extrajudicial statements which are admissible as exceptions to the hearsay rule, however. It assumes relevance. The *Morales* declarant had stated, several months before the murder for which the defendant was on trial, that he planned to commit another murder, and possibly the offense for which the defendant was being tried, saying that the defendant would be with him and would help him. We held that the statement was admissible under the state-of-mind exception to the hearsay rule (Evid. Code, § 1250) and was relevant to show the declarant's intent to engage the defendant in a conspiracy that might include the murder.

Here, however, the guilty pleas of Cummings, while admissible against Cummings as a declaration against his own penal interest, or as a confession or admission, say nothing about Gay. The inference, if any, to be drawn from the pleas bears none of the indicia of reliability which justify exceptions to the hearsay rule and, in turn, to the right of confrontation and cross-examination. The reasoning of *People* v. *Morales, supra,* 48 Cal.3d 527, is simply inapplicable.

We conclude therefore that the evidence of Cummings's guilty pleas was inadmissible.

F. *Sufficiency of Evidence—Count VII*

█ Gay did not admit complicity in the attempted robbery charged in count VII, that committed at the Designer Florist, and contends that the

evidence was insufficient to support the verdict. We do not agree. The only issue as to the sufficiency of the evidence is that of identifying Gay as a perpetrator. Rodriguez testified that two Black men entered her shop. She named Raynard Cummings and Kenneth Gay as those men, naming Gay as the person who grabbed her, told her to get to the floor, and beat her over the head with a gun.[64]

Rodriguez did not identify Gay at trial, and when asked if she had looked at him testified that he was not in the courtroom, a statement she repeated several times. When Gay was pointed out to her, she said that he was not the man who had assaulted her. She had, however, given the police a description of her assailant in which she had stated that he was a light-skinned Black man with loose curly hair and a moustache, who was between five feet, ten inches and six feet tall, weighing about one hundred fifty pounds.

Pamela testified, however, that she, Gay, and Cummings had driven to the florist shop on May 20, 1983. She looked around in the shop and then advised the two men what she had seen, and saw both men enter the shop where they remained for about 10 minutes. They returned walking quickly. Both had blood on their clothes. The owner of a nearby store testified that he saw the car in which Pamela was waiting parked at the rear of the florist shop at the time of the attempted robbery.

Gay contends that Pamela's testimony was not corroborated. (§ 1111.) He also argues that if, as the People argue, there was corroboration in the inference that because Gay was Cummings's crime partner he was the second man in the florist shop, that corroboration was so slight that admission of evidence that Cummings had pleaded guilty to that offense was necessarily prejudicial.

We conclude that the evidence was sufficient and that it is not reasonably probable that had evidence of Cummings's guilty plea been excluded a different result would have been reached. Pamela's testimony was corroborated, not only by an inference that Gay was the second robber because he was Cummings's crime partner in other recent robberies, but by Rodriguez herself. Although she did not recognize Gay in court, her description of the second robber, given at the time of the offense when Gay's appearance was different, closely matched his height and skin color, and the description given by other witnesses who testified later during the trial of the murder

---

[64]The witness testified during an earlier hearing held pursuant to Evidence Code section 405, that she knew defendant's name from newspaper clippings she had kept. She also acknowledged that without photos in those clippings and television broadcasts in which she had seen pictures of Gay she would not be able to identify him.

charge regarding Gay's appearance only two weeks after the attempted robbery of Rodriguez.[65] Those witnesses also testified that at that time Gay had a moustache and gericurls. Ms. Rodriguez's description tended to implicate Gay in the crime and thus was sufficient corroboration. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1228 [283 Cal.Rptr. 144, 812 P.2d 163].) "Evidence of corroboration is sufficient if it connects the defendant with the crime, even though it is slight and would be entitled to little consideration when standing by itself." (*People* v. *Price*, *supra*, 1 Cal.4th 324, 444.) The corroboration here was more than "slight."

### G. *Impact of Errors.*

 Although we have concluded that the trial court erred in admitting evidence of Cummings's pleas of guilty to the robbery-related counts, and of Robin's conviction as an accessory to the murder, and that instructional error necessitates reversal of the robbery-related counts, those errors did not affect the Gay jury's consideration of the murder and special circumstances charges.

Evidence regarding the recent criminal conduct of both Gay and Cummings was admissible for the purpose of establishing that when they were stopped and questioned by Officer Verna, Gay and Cummings had good reason to believe that an arrest was imminent. The existence of that motive was relevant, in turn, to establish that the murder was intentional, deliberate, and premeditated, and that defendants killed Officer Verna to avoid arrest. The omission of instructions on robbery could not have affected the jury's consideration of the evidence for that purpose. It is not reasonably probable that the Gay jury would have reached a different verdict absent the error, therefore.

We reach the same conclusion with respect to the erroneous admission of evidence of Cummings's guilty pleas and Robin's conviction. The evidence of both guilt of the murder and the motive for it was overwhelming. The evidence of motive was not limited to evidence of the robberies of which Gay was convicted, but included evidence of the joint commission of another robbery, evidence that the car used by defendants was stolen, and evidence of parole violation. It is not reasonably probable that the Gay jury would have reached a more favorable result with respect to the murder absent knowledge of this evidence.

---

[65]Photographs of Gay as he appeared at that time were also admitted.

## VI.

### Penalty Phase

Since the penalty phase of the trial proceeded separately before each defendant's jury, their claims must be separately addressed.

### A. *Cummings.*

#### 1. *Notice.*

Section 190.3 precludes presentation of any evidence in aggravation, except for rebuttal, "unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial."

Cummings contends that the prosecution failed to give timely notice of the evidence of aggravating factors that was to be introduced at the penalty phase and that the notice given was not sufficiently specific. He claims that the manner in which notice was given caused severe prejudice in his ability to counter the evidence and because the failure to give notice prior to trial affected the manner in which he selected jurors.

It may be, as Cummings argues, that the prosecution's method of giving notice was inadequate. He did not give written notice of the particular incidents reflected by documents in the voluminous file that were to be offered at the penalty phase. However, the trial court agreed and excluded much of the evidence the prosecutor proposed to offer, including evidence regarding the robberies to which Cummings had pleaded guilty,[66] as well as evidence of robberies and incidents of disruptive prison conduct in Pennsylvania and Delaware. The court also excluded evidense that did not fit within the statutory criteria for evidence in aggravation.

The trial court found that notice had been timely and sufficient with respect to the remaining evidence.

We agree. Although one item was a robbery of which the prosecution had notice prior to the commencement of jury selection, notice was given only one day after the general voir dire commenced. The trial court found no bad faith in failure to discover and give notice of the additional robbery at an earlier date.

---

[66]The jury was, however, permitted to consider the fact that Cummings had been convicted of the robberies, attempted robberies, and conspiracy.

Defense counsel had notice of the poisoned stamps and shank incidents several months in advance of jury selection and trial. Cummings's claim that the notice was not sufficiently specific to enable him to consider these incidents in jury selection necessarily fails since he did not question the adequacy of the notice prior to jury selection.

We also agree with the trial court that more specific notice of the incidents about which evidence is to be offered should be given. (See *People* v. *Keenan* (1988) 46 Cal.3d 478, 525 [250 Cal.Rptr. 550, 758 P.2d 1081].) Section 190.3 does not require that the prosecutor make a binding election as to the evidence in aggravation that will be presented at the time notice is given, however. It is sufficient that the incident is among those of which notice was given. (*Keenan, supra,* at p. 525.)

In any event, the remedies for failure to give adequate notice include either exclusion of the evidence or granting a continuance to enable the defendant to prepare. Cummings does not contend that the trial court failed to give him sufficient time and may not, therefore, predicate a claim of prejudice on an assertion that the notice was not timely and adequate. (*People* v. *Pinholster, supra,* 1 Cal.4th 865, 957-958.)

2. *Instructions.*

a. *Davenport error.*

Cummings next claims that the instructions given by the court were misleading and caused the jury to believe that the absence of a mitigating factor was itself aggravating.

This claim lacks merit. The court instructed the jury: "If any factor is not found by you to be a mitigating factor in and of itself, it does not make that factor an aggravating factor."

The jury was also instructed that the factors the court had listed "may be considered by you, if applicable, as either aggravating factors or mitigating factors." This additional instruction, which Cummings now argues is misleading (see *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861]), was requested by the defense. Assuming, therefore, that the instruction was misleading, Cummings may not complain that it was given. (*People* v. *Whitt* (1990) 51 Cal.3d 620, 640 [274 Cal.Rptr. 252, 798 P.2d 849]; *People* v. *Lang, supra,* 49 Cal.3d 991, 1031-1032.)

b. *Individualized sentencing determination.*

The trial court instructed the jury in the language of section 190.3: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose the sentence of death. However, if you determine

that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison without possibility of parole."

This case was tried prior to our decision in *People* v. *Brown* (1985) 40 Cal.3d 512, 538 [220 Cal.Rptr. 637, 709 P.2d 440] reversed *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837] in which we expressed concern that absent supplementation this instruction could mislead the jury. We believed there was a danger that the jurors might not understand that they are free to assign whatever value they believe is appropriate to the aggravating and mitigating evidence and that they have discretion to determine the appropriate penalty. The instruction should not be understood to mean that the weighing process is simply a mechanical determination that aggravating or mitigating factors outnumber the other. (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1037 [254 Cal.Rptr. 586, 766 P.2d 1].)

■■■ Cummings contends that he was denied an individualized sentencing determination, that the prosecutor's argument misled the jury into believing that penalty determination was a mechanical process, and that the trial court erred, under an implicit holding in *People* v. *Brown, supra,* 40 Cal.3d 512, by failing to instruct the jury that life without possibility of parole is the presumptive penalty for murder with special circumstances.

To ensure that jurors were not misled by instructions in the statutory language alone when no supplemental or clarifying instructions have been given, we have examined the whole record to determine whether the jury may have been misled and, if so, whether the defendant was prejudiced. (*People* v. *Lang, supra,* 49 Cal.3d 991, 1034; *People* v. *Brown, supra,* 40 Cal.3d 512, 544, fn. 17.) Although the instructions have been upheld by the United States Supreme Court against constitutional attack (*Boyde* v. *California* (1990) 494 U.S. 370, 376-377 [108 L.Ed.2d 316, 326-327, 110 S.Ct. 1190]), we have continued to do so. (See, e.g., *People* v. *Clark* (1992) 3 Cal.4th 41, 165 [10 Cal.Rptr.2d 554, 833 P.2d 561].)

In this case, however, the court anticipated *People* v. *Brown, supra,* 40 Cal.3d 512, and did give clarifying instructions. The jury was instructed: "In considering, taking into account, and being guided by the aggravating and mitigating circumstances, you must not decide the effect of such circumstances by the simple process of counting the number of circumstances on each side. The particular weight of such opposing circumstances is not determined by the relative number but by their relative convincing force on the ultimate question of punishment."

This instruction informed the jurors both that the weighing process was not mechanical and that they had discretion to determine the appropriate penalty based on their view of the force of the evidence. We have, nonetheless, reviewed the arguments of counsel and find in them nothing to support Cummings's further claim that the prosecutor misled the jurors. Instead, he reinforced the court's instruction, telling the jurors that the penalty determination was "a weighing process. Obviously not by number, but by importance." He also advised them that if in the weighing process the mitigating factors "tip this side of the scale down even just a little, or if it stays even the way it started out in the weighing process, you should come back with life." His subsequent suggestion that after determining whether a factor was aggravating or mitigating the jury should place it on one side or the other of "the scale" did not, in context, imply that a mechanical weighing process was appropriate.

The jury was told again in the final argument by Cummings's counsel that ". . . no one can force you to give the death penalty. You are not required to give the death penalty. The law does not require it. The facts do not require it." He expressed inability to weigh the various factors as suggested by the prosecutor and emphasized that ". . . it is not a question of numerical or statistical analysis. You don't count up the number of factors on each side. That is not what the law is, and that is not what her honor read to you. You weigh them." He also reminded the jury that they were to determine the "appropriate" penalty.

We are satisfied that the instructions were not misleading and that the jury was adequately informed as to its sentencing discretion. No legitimate basis exists for believing that the jury may have been misled regarding its sentencing responsibilities. (*People* v. *Ghent, supra*, 43 Cal.3d 739, 777.) We reject for the same reasons Cummings's additional contention that the prosecutor's argument may have lessened the jurors' sense of personal responsibility for choosing a death sentence. (See *Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 238-240, 105 S.Ct. 2633].) The argument in this case was not comparable to those we found improper in *People* v. *Milner* (1988) 45 Cal.3d 227, 257 [246 Cal.Rptr. 713, 753 P.2d 669], and *People* v. *Farmer* (1989) 47 Cal.3d 888, 928 [254 Cal.Rptr. 508, 765 P.2d 940].[67]

---

[67]In response to the argument of Cummings's counsel that the jury had no more right to take Cummings's life than Cummings had to kill Officer Verna, the prosecutor told the jury that their authority came from the people of the State of California who had voted the law in. He also told the jury that the feeling they should have after the case was concluded was that they had obeyed the rules they were supposed to obey by voting on the evidence rather than on personalities or emotion, or like or dislike of the lawyers. "That is the feeling that I want

### 3. *Prosecutorial misconduct.*

Cummings argues that the prosecutor again committed "*Griffin* error" by referring in the penalty phase argument to Cummings's failure to testify at the penalty phase, improperly displaying a photograph of the victim, and arguing facts not in evidence.

#### a. *Griffin error.*

■ Cummings failed to object to the lack of remorse argument, which was not *Griffin* error in any case. (*Griffin* v. *California, supra,* 380 U.S. 609.) The prosecutor's reference to Cummings's lack of remorse was not a comment on his failure to take the stand, but was a legitimate reference to Cummings's repeatedly expressed pride in having killed Officer Verna. There was no impropriety. (*People* v. *Keenan, supra,* 46 Cal.3d 478, 509.)

#### b. *Photograph.*

■ The display of the 12-inch by 15-inch or larger photograph of Officer Verna was improper because the court had previously ruled, at the guilt phase, that it was inadmissible. The photograph had been shown to the jury several times at the earlier stage of the trial although it had not been admitted into evidence. The trial court ruled that the photograph should not have been displayed at the penalty trial, but it also ruled that the display was not prejudicial since appeals to sympathy by either side were permissible during the penalty phase.[68] The court nonetheless admonished the jury that it was not to consider the photograph as raising any sympathy for the victim.

Since the photograph was not relevant to any aggravating factor, we agree with Cummings that it was not relevant. We do not agree, however, that Cummings suffered prejudice. There is no reasonable possibility that the jury's sentencing discretion was affected by the photograph. (*People* v. *Siripongs* (1988) 45 Cal.3d 548, 583 [247 Cal.Rptr. 729, 754 P.2d 1306].)

#### c. *Argument.*

Cummings had pleaded guilty to the robbery of Linda Smith in which her automobile had been taken. No evidence regarding that robbery had been presented at the penalty phase. In his recital of aggravating factors the

---

you to come away with whatever the verdict is. That I followed the rules of law and I voted the evidence."

[68]The court again found that the display was not prejudicial at the close of penalty phase evidence when a mistrial motion based on the display was denied.

prosecutor referred to this offense stating: "The first of these incidents was the taking of the automobile from Linda Smith. Linda Smith was on the stand for about 15 seconds, so you probably don't remember. An older woman in her early 70's, said Mr. Cummings took her car from her at gunpoint. That is a robbery, taking property by force . . . [t]hat is aggravating factor number 18."

■ Cummings claims that because no evidence of that offense had been presented at the penalty phase and he had received no notice that it would be offered in aggravation, the above reference to the offense was improper. It was not. Smith had testified. The jury may consider all evidence presented at the guilt phase in proof of the capital offense and the special circumstances. It was permissible for the jury to consider Cummings's conduct during the robbery as an aggravating factor. (*People* v. *Melton* (1988) 44 Cal.3d 713, 764 [244 Cal.Rptr. 867, 750 P.2d 741].)

Since the notice requirement does not include evidence presented for that purpose during the guilt phase (§ 190.3), there was no error or impropriety.

Cummings fails to identify or provide a citation to the record to enable the court to identify additional statements which he claims constituted misconduct. Those are said to be statements in which the prosecutor assertedly referred improperly to "intemperate remarks" of Cummings in his admissions to Alfredo Montes, and Officers LaCasella and McCurtin as "crimes." We infer that the claim is addressed to the prosecutor's argument that the mitigating evidence did not outweigh "all these crimes," and other references to the aggravating evidence as evidence of "crimes." We see no possibility that the jury would understand the argument in the manner suggested by Cummings or that the failure to point out to the jury that not all of the aggravating evidence established crimes affected the jury's exercise of discretion in selecting the appropriate penalty.

■ The same is true with respect to the prosecutor's reference to Cummings as a "one man crime wave." The jury would most reasonably understand the reference to be to the evidence before the jury of the numerous robberies committed by Cummings in the period immediately before the murder. Cummings's suggestion that the jury might have believed the reference was to offenses of which no evidence had been presented is speculation which is unwarranted by the record.

4. *Victim impact evidence.*

■ At the hearing on Cummings's automatic motion for reduction of the penalty (§ 190.4) the widow of Officer Verna was permitted to testify

about the victim and the impact of his death on his family. Cummings argues that because section 1191.1 makes consideration of victims and next of kin mandatory at sentencing hearings, the trial court necessarily considered that testimony and thereby violated the Eighth Amendment as construed in *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], which held that only the defendant's character, background, and offense are relevant sentencing factors.

We have held that the trial court should not consider victim impact evidence, which the court must consider in imposing sentences under the determinate sentencing law, prior to ruling on the section 190.4 motion. (*People* v. *Jennings* (1988) 46 Cal.3d 963, 994 [251 Cal.Rptr. 278, 760 P.2d 475].) However, the high court has since reconsidered *Booth* v. *Maryland*, *supra*, 482 U.S. 496, and has largely overruled it. (*Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597].) Moreover, the trial court scrupulously adhered to the statutory limitation on matters to be considered by the court and, in a lengthy recital of findings made pursuant to section 190.4, made no reference to any evidence that was not before the jury. There is no reversible error.

### 5. *Unsealing of Gay verdict.*

The Gay jury returned a verdict of death on July 3, 1985, prior to the commencement of the Cummings penalty trial. Although the parties had stipulated that the verdict would remain sealed, the court, after a conference with Gay's attorney alone, unsealed the verdict of death which was widely reported in the press. Cummings moved to impanel a new jury in part because two of the Cummings jurors had learned that a verdict had been reached. The court questioned those jurors, one of whom had immediately closed the newspaper and did not know what the verdict was. The other juror had seen a newspaper headline, knew what the verdict was, but had not read the article. She assured the court, however, that she could be impartial in reaching a penalty verdict in Cummings's case. The motion to impanel a new jury and motions to excuse those two jurors were denied.

Cummings contends that in these circumstances prejudice should be presumed and that the People should bear the burden of overcoming the presumption just as they must when juror misconduct leads to the jurors considering matters that were not admitted into evidence at trial.[69]

The procedure followed by the court was proper. Even if inadvertent, it is misconduct for a sitting juror to read a newspaper article relating to the trial.

---

[69]Cummings also argues that the danger of a jury obtaining knowledge of such facts is great when dual juries are used, that there was no justification for unsealing the verdict, and that unsealing should be forbidden. The record does not reveal the reasons for the decision to

If that occurs the trial court should conduct a hearing "into whether and to what extent the jury as a whole may have been affected and whether there was good cause to discharge any of the jurors." (*People v. Hernandez* (1988) 47 Cal.3d 315, 338 [253 Cal.Rptr. 199, 763 P.2d 1289].) The court did so here, and it found that only two jurors had knowledge of the news reports and that both could be impartial. The inquiry was sufficient to rebut any presumption of prejudice that might arise from the jurors' inadvertent exposure to the news reports of the Gay verdict.

6. *Miscellaneous claims.*

Conceding that this court has rejected the claims in the past, Cummings argues that:

a. Failure to delete inapplicable sentencing factors from the penalty phase jury instructions results in confusion and capriciousness in the result, thereby violating his right under the state and federal Constitutions to reliable and fair sentencing.

b. Failure to designate which factors are aggravating and which are mitigating denies the same right.

c. Permitting jury consideration of unadjudicated crimes as aggravating evidence denies due process and rights under the Sixth and Eighth Amendments.

d. Failure to require that the jury find beyond a reasonable doubt that death is the appropriate punishment violates the state and federal Constitutions.

e. Failure to require that the jury find beyond a reasonable doubt that aggravating factors outweigh mitigating factors violates the state and federal Constitutions.

f. The 1978 death penalty law is unconstitutional because it does not require written findings identifying the aggravating factors found by the jury, proof beyond a reasonable doubt of those factors, jury unanimity on the presence of the factors, or a determination that death is the appropriate punishment beyond a reasonable doubt, and because it lacks a procedure for meaningful evaluation of the sentencer's decision by the reviewing court.

unseal the Gay verdict, but there are suggestions that the court believed it would be necessary to discharge the jurors and that they, counsel, or Gay himself was likely to discuss the verdict publicly if it remained sealed.

g. Failure to instruct that a sentence of life without possibility of parole means that parole cannot be granted, and failure to correct the commonplace misunderstanding regarding release of prisoners sentenced to life imprisonment results in an unfair, capricious, and inaccurate sentence in violation of the Sixth, Eighth, and Fourteenth Amendments.

h. Ambiguous language in the instruction on section 190.3, factor (b) in CALJIC No. 8.84.1 results in "double-counting" and thus artificially inflates the aggravating factors in violation of Cummings's state and federal constitutional rights to reliable and nonarbitrary sentencing.

i. Failure to instruct on the elements of "criminal activity" introduced in aggravation violates the right to reliable, nonarbitrary sentencing determination, determination of factual issues by an unbiased, properly instructed jury, and the presumption of innocence under the state and federal Constitutions.

j. Failure to require jury unanimity on prior criminal activity violates the same rights.

k. Section 190.3, in conjunction with former CALJIC No. 8.84.2, violates federal due process by creating an impermissible presumption of death at the penalty stage.

 We have recently declined to reconsider our past decisions rejecting these arguments (see, e.g., *People* v. *Alcala* (1992) 4 Cal.4th 742, 810 [15 Cal.Rptr.2d 432, 842 P.2d 1192]; *People* v. *Mickey* (1991) 54 Cal.3d 612, 700-701 [286 Cal.Rptr. 801, 818 P.2d 84].) To the extent that Cummings's claims may differ, we find no merit in them.[70]

---

[70]Defendants also claim that the failure of the court to order that all conferences at the bench and in chambers be reported (§ 190.9) resulted in an inadequate appellate record. They did not request that the conferences be reported. The participants' lack of recall made it impossible to settle the record with respect to these conferences for inclusion in the record on appeal. (Cal. Rules of Court, rule 36(b).)

Although the trial court erred in failing to order all matters reported (*People* v. *Roberts* (1992) 2 Cal.4th 271, 340, fn. 20 [6 Cal.Rptr.2d 276, 826 P.2d 274]; Cal. Rules of Court, rule 39.5(c)), the error is not one which is reversible error per se. (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1165-1166 [824 P.2d 1315].) Failure to report bench or chambers conferences between counsel and the trial judge is not a "structural defect affecting the framework within the trial proceedings." (See *Arizona* v. *Fulminate* (1991) 499 U.S. __ [113 L.Ed.2d 302, 111 S.Ct. 1246].) Section 190.9 applies only to capital cases. It has never been suggested that either the adequacy of an appellate record or the fairness of the proceedings necessarily is affected by failure to report bench and chambers conferences. (See *People* v. *Pinholster*, *supra*, 1 Cal.4th at pp. 919-923.)

The parties may waive the right to have a matter transcribed. (*People* v. *Gaston* (1978) 20 Cal.3d 476, 485 [143 Cal.Rptr. 205, 573 P.2d 423].) While it is not clear whether defendants

## B. *Gay.*

### 1. *Threat evidence.*

Section 190.3, factor (b), permits jury consideration as an aggravating factor of: "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

The People offered evidence of oral threats Gay made, while confined in the Los Angeles County jail, to Deputy Sheriff Koch. In one statement Gay threatened to "come after" Koch and his family; in another he threatened battery on Koch. Gay argues that the evidence was inadmissible since the oral threats did not constitute criminal activity, and there was no present ability to carry out the threats. (See *People* v. *Tuilaepa, ante,* pp. 569, 590 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)

He failed to object, however.[71] Admission of the evidence was harmless in any event. It would have been admissible to impeach Gay's expert who testified that Gay would function well in a prison setting (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1103 [259 Cal.Rptr. 630, 774 P.2d 659]; *People* v. *Keenan, supra,* 46 Cal.3d 478, 514), and it is clear that Gay's decision to offer that evidence was not affected by the fact that other evidence of more serious misconduct in jail was to be offered.

### 2. *Robbery evidence.*

Gay argues, for the reasons offered in support of the same claims made with respect to the guilt phase, that evidence of his admissions and confessions to the robbery-related offenses should not have been admitted as evidence in aggravation at the penalty phase. Having rejected those arguments above, we need not reconsider them here.

### 3. *Prosecutorial misconduct.*

Gay contends that the prosecutor's penalty phase argument that Gay had shown no remorse for any of his actions was a comment on his

---

did so here, on appeal the court does not presume prejudice. Even in the absence of a waiver a complaining party bears the burden of demonstrating that the appellate record is not adequate to permit meaningful appellate review. (*People* v. *Howard, supra,* 1 Cal.4th 1132, 1165; *People* v. *Chessman* (1950) 35 Cal.2d 455, 462 [218 P.2d 769, 19 A.L.R.2d 1084].)

[71]He now argues that an objection prior to the penalty trial was adequate. He concedes that the objection he made was to testimony by a witness his counsel identified as "Ruano," and that the People stated the correct name was "Cupa." Deputy Cupa was a different witness. Gay states that it was "clear from the testimony" that his objection related to Koch's testimony. Since we do not expect clairvoyance of our trial courts, Gay had an obligation to object or move to strike the testimony of Koch.

failure to testify, forbidden by *Griffin* v. *California, supra*, 380 U.S. 609. Again, he failed to object. (*People* v. *Green, supra*, 27 Cal.3d 1, 27.)

Moreover, as the context of the argument reveals, the argument was not directed to Gay's failure to testify, but to his past conduct over many years and his apparent lack of remorse, an attitude which caused the psychiatric expert to conclude that Gay was a sociopath.[72] There was no misconduct.

### 4. *Individualized sentencing determination.*

Gay also argues that the trial court's instruction in the language of section 190.3 misled the jury with regard to its sentencing discretion.[73] At his trial, however, the court gave only the "unadorned" instruction without clarification as to the jury's role. Gay argues that this omission, coupled with the argument of the prosecutor which, he claims, emphasized the apparently mandatory nature of the statutory language, misled the jury.

We are satisfied that the jury was fully and accurately apprised of its role in determining the appropriate penalty. Although the prosecutor did refer to the statutory language, he also told the jury that it was to select the punishment that matched Gay's adult life. He told the jurors, after reading the instruction they were to receive, that the jury was to balance the factors, not just by counting them, but by their seriousness and importance.[74]

Defense counsel also explained that the issue at the penalty phase was to decide what was the appropriate penalty. He told the jurors that any aspect of Gay's background or character could be considered to dissuade the jury from voting for death and that they could assign any weight to a mitigating factor and need not add up the factors.

---

[72] The prosecutor argued that the expert had concluded Gay was a sociopath who was "unable to learn from what goes on. And that is what we have here. There is some part missing in Kenneth Gay that almost everybody else has."

[73] Like Cummings, Gay also argues that the instruction creates an unconstitutional presumption in favor of death and that the court must instruct the jury that the law presumes that life without the possibility of parole is the appropriate punishment. We reject those claims for the reasons already stated.

[74] The jury was also told that if Gay had "put on perhaps just one factor in mitigation but you consider it very, very important, that would outweigh a dozen that the prosecution could present that might not be too important. So it is the quality of those factors that you should think about. If there are more aggravating factors it says—it is actually mandatory language—you shall impose a sentence of death. It doesn't even say 'may.' No one is ever going to take discretion away but that is the rule."

## 5. CALJIC No. 1.00

### a. Sympathy/consideration of mitigating evidence.

At the guilt phase of the trial the court instructed the jury in the language of CALJIC No. 1.00 that it should not be "swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." At the penalty phase the jury was given copies of the guilt phase instructions to take into the jury room and was advised that they were correct statements of the law.

■ Gay acknowledges that the jury was expressly instructed at the penalty phase that it could consider pity, sympathy, and mercy for him in determining the question of penalty. He argues, however, that because the jury was not advised that this express instruction took precedence over the guilt phase instruction, the jurors may have misunderstood their obligation to consider all of the mitigating evidence.

The argument is wholly speculative. It ignores the fact that the instruction given was specific, and it overlooks the argument of both counsel. The prosecutor told the jurors that if they wanted to consider sympathy for Gay they could "go ahead and do that."[75] The prosecutor also discussed the mitigating evidence. He did not suggest that it could not be considered, but he argued instead that what the jury should focus on was Gay's adult life. Again, we find no reasonable likelihood that the jury did not understand that it could consider all of the mitigating evidence offered by Gay. (*Boyde* v. *California, supra,* 494 U.S. 370, 381 [108 L.Ed.2d 316, 329-330]; *People* v. *Roberts, supra,* 2 Cal.4th 271, 338.)

### b. Consequences of the decision.

CALJIC No. 1.00 also instructs the jury that it should "reach a just verdict regardless of the consequences." That instruction should not be given at the penalty phase of a trial. (*People* v. *Brown, supra,* 40 Cal.3d 512, 537, fn. 7.)

Gay argues that having a copy of CALJIC No. 1.00 among those taken into the jury room, may have lessened the jurors' sense of responsibility for

---

[75]Gay also claims that the prosecutor misled the jury when he went on to state that he "would like you to approach this case as calmly and analytically as you possible can. If you do that and if you follow this rule, you are not going to have any trouble at all coming back to a just punishment."

If this is a claim of prosecutorial misconduct, there was no objection. To the extent that Gay reasons that this might have led the jurors to believe that the law did not give them discretion either as to exercising mercy or in determining the appropriate penalty, the claim lacks merit. The argument cannot reasonably be understood to imply that the procedure was mechanical or that sympathetic concerns and mitigating evidence were not to be considered.

their verdict. That possibility was enhanced, he claims, by the prosecutor's argument that the instructions gave the jurors the "tools that you can use to do the right job" and that they then could say that they had done what they were supposed to do and had followed the rules.

As we have noted above, however, the argument did not convey the impression that the process for determining the penalty was mechanical. When the prosecutor told the jurors that if they would "follow this rule, you are not going to have any trouble at all coming back to a just punishment," he referred to his request that they approach the case calmly and analytically. He told the jurors that their duty was "difficult" and that they had a "heavy responsibility." There is no possibility that the jurors were misled or had their sense of individual, personal responsibility for the verdict diminished.

Therefore, assuming it was error to include a copy of this instruction among those the jury was permitted to take into the jury room, the record satisfies us that the error was harmless. (See *People* v. *Nicolaus* (1991) 54 Cal.3d 551, 585 [286 Cal.Rptr. 628, 817 P.2d 893].)

 6. *Robbery instructions.*

At the penalty phase the jury was instructed with the full definition of robbery: "The crime of robbery is the taking of personal property in the possession of another from his person or immediate presence and against his will, accomplished by means of force or fear and with the specific intent to permanently deprive such person of the property." That instruction was accompanied by a further instruction that to prove commission of robbery "the following elements must be proved:

"One, that a person had possession of property of some value, however slight;

"Two, that such property was taken from such person or from his immediate presence."

 Gay contends that the failure to instruct on the remaining elements was prejudicial error. He recognizes that the court has no sua sponte duty to instruct on the elements of other crimes introduced at the penalty phase as aggravating factors. He argues, however, that if instructions are given the court has a duty to instruct correctly.

We agree that the court must instruct correctly, but here the court gave the complete definition of the crime of robbery, including all of the elements.

The elements not separately identified—a taking against the will of the person, by force or fear, and intent to permanently deprive—were not in dispute, and instructions on the last element had been given at the guilt phase.

Since all of the elements had been included in the first part of the instruction, and the evidence that property had been taken by means of force and/or fear and against the will of the victims was overwhelming, the omission in the latter part of the instruction was harmless.

### 7. *Order of instructions.*

Gay next contends that the order in which the penalty phase instructions were given was so disorganized that it may have led to an arbitrary and capricious penalty determination.[76] We have reviewed the instructions and find nothing to support Gay's speculation that the jury may have been confused. The progression of the instructions in this case followed a logical order. The order in which instructions are given is generally immaterial (*People* v. *Sanders* (1990) 51 Cal.3d 471, 519 [273 Cal.Rptr. 537, 797 P.2d 561]) and is so here.

### 8. *Victim impact.*

For the reasons stated above in relation to the identical claims by Cummings, we reject the claims of Gay that reversible error occurred when the court considered statements by Officer Verna's wife and friends prior to ruling on the automatic motion for reduction of penalty.

Gay also argues that the prosecutor's reference during closing argument to the impact on members of Verna's family and on others among his victims requires reversal of the penalty verdict. Some of the argument to which he now objects was not improper, even before *Payne* v. *Tennessee, supra,* 501 U.S. __ [115 L.Ed.2d 720] (see *People* v. *Clark, supra,* 50 Cal.3d 583, 629; *People* v. *Karis, supra,* 46 Cal.3d 612, 641), and the remaining remarks were brief. The prosecutor referred to the circumstances of the offenses committed by Gay—injuries suffered by robbery and arson victims and the grief and anger that must have been suffered by members of Officer Verna's family. Therefore, and because *Booth* v. *Maryland, supra,* 482 U.S. 496 was overruled in major part in *Payne,* this argument fails.

---

[76]Gay complains that instructions on sympathy and the nature of the balancing process were inserted among instructions on the elements of crimes in aggravation. They were not. The instructions followed those on general and specific intent and an instruction relating that intent to evidence of other criminal conduct.

### 9. *Miscellaneous claims.*

Gay repeats the several arguments made by Cummings directed to the constitutional validity of the 1978 death penalty law, the procedures for implementing it, and the alleged imperfections in the instructions to the jury.[77] We reject them for the reasons stated above.

He also claims that evidence of his purportedly violent conduct as a juvenile was barred by the statute of limitations and its admission violated his statutory, due process, and Eighth Amendment rights, and that "relitigation" of the facts underlying his previous convictions with the use of live testimony violated his right to a reliable sentence determination and constituted evidence that he had no opportunity to rebut. He concedes that these claims, too, have been repeatedly rejected by the court. (*People* v. *Jennings, supra,* 46 Cal.3d 963, 981-982; *People* v. *Karis, supra,* 46 Cal.3d 612, 638-641.) We see no need to reconsider those decisions here.

His claim that the statutory language of section 190.3, and in particular factors (a) and (i) of section 190.3, permits random imposition of the death penalty was also rejected in *People* v. *Tuilaepa, supra, ante,* 569, at pages 594-595.

## VII.

### INEFFECTIVE COUNSEL—GAY

Gay contends that he received constitutionally inadequate representation by his trial counsel at both the guilt and penalty phases.

(64) To establish that counsel has rendered constitutionally inadequate assistance a defendant must show that: (1) the representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) prejudice, i.e., that absent counsel's failings a more favorable result would have been probable. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693, 104 S.Ct. 2052]; *In re Wilson* (1992) 3 Cal.4th 945, 950 [13 Cal.Rptr.2d 269, 838 P.2d 1222]; *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1057-1058 [5 Cal.Rptr.2d 230, 824 P.2d 1277].) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland* v. *Washington, supra,* 466 U.S. 668, 694 [80 L.Ed.2d

---

[77]Gay also claims that he was not advised by the prosecutor prior to either the guilt or penalty phase of the aggravating circumstances to be utilized at the penalty trial. We infer that this claim is addressed to a failure to advise him of the evidence which the People intended to introduce or on which they would rely.

Gay does not indicate that he objected to the introduction of evidence on this ground (see *People* v. *Mickey* (1991) 54 Cal.3d 612, 685 [286 Cal.Rptr. 801, 818 P.2d 84]), and his claim that he received no notice is not supported by the record on appeal.

674, 698].) The claim may be raised on appeal. However, when the record does not reflect the reasons for an attorney's act or omission, and the act or omission may be explained on the basis of acceptable tactics or other reason which brings the conduct within the range of reasonable competence, a claim of ineffective counsel is more appropriately brought by petition for writ of habeas corpus. (*People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

### A. *Guilt Phase.*

 Gay identifies numerous acts and omissions by counsel during and before trial as conduct which, he asserts, established that the quality of representation he received fell below constitutional norms. The first and arguably the most prominent of these is Gay's assertion that his attorney's incompetence resulted in admission of the statement in which Gay admitted participation on the robberies,[78] would not be admitted at trial.

Gay also identifies instances in which counsel elicited or presented harmful testimony. He did so during cross-examination of several witnesses. From Detective Holder he elicited testimony that there had been no agreement that the taped statement would not be used, and testimony that in Holder's view Gay had been truthful when he admitted participating in the robberies. He introduced a statement by Cummings to police in which Cummings inculpated Gay in several of the robberies, evidence that would corroborate Pamela's testimony even if Gay's own admissions were excluded or disbelieved. He failed to object when Rodriguez, who after looking at Gay had testified that he was not the person who robbed her, testified that "Mr. Gay" was that person. In the cross-examination of Pamela he elicited harmful testimony that she and defendants were in the Lakeview Terrace neighborhood on the day of the murder to purchase drugs, that Gay and Cummings jointly owned a second gun, and that the bullets were usually kept in Gay's apartment.

In addition, counsel failed to object to the testimony of Deputies McCurtin and LaCasella regarding statements by Cummings which Gay has alleged implicated him and thus were inadmissible under *Bruton* v. *United States, supra,* 391 U.S. 123. He failed to object to that part of the prosecutor's closing argument in which he suggested to the jury that they could logically infer from Cummings's statement that Gay was involved.

---

[78]Although the testimony of Gay and his attorney at the Evidence Code section 405, hearing on the admissibility of the statement regarding their discussions prior to the statement was not rebutted, the trial court made no finding other than finding that the statement was voluntary. There is no indication in the record that she found either Gay or his attorney credible witnesses.

Counsel introduced a statement by Pamela which placed blame on Gay alone for the murder, and he introduced a "sympathetic" photo of Officer Verna. He failed to object on grounds that it was unduly prejudicial (Evid. Code, § 352) to admission of a secretly taped recording of a discussion between Gay and Cummings in which Gay discussed his suicide attempt, and he did not object to testimony by the doctor who treated Gay and offered by Cummings that Gay said he had "nothing to live for."

Although Rose Perez had not identified Gay in her testimony on direct examination, when counsel for Cummings cross-examined her he referred to Gay as the "assailant" several times before counsel for Gay objected. He did not object, either for lack of foundation or as unduly prejudicial, to the prosecutor's use of a slide presentation to illustrate his theory of the case.

Gay notes that counsel failed to cross-examine Gail Beasley and did not introduce expert testimony regarding the unreliability of eyewitness identification or Robin's testimony that Cummings had admitted killing Officer Verna.

Finally, Gay faults counsel for failing to submit written pretrial motions for separate trials and to quash the jury panel; for simply joining in motions made by counsel for Cummings; for offering inadequate support for the few motions he did make; and for calling only three witnesses, all of whom had already testified for the prosecution, in the defense case-in-chief.

The record does not reflect a tactical purpose for many of the acts and omissions on which Gay relies for his claim of ineffective counsel. In some instances in which a failure to object is asserted as a failing, it does not appear that a meritorious basis for objection was available.

Most importantly, however, many of the acts and those which, if not based on acceptable tactics, had the greatest potential for prejudice have to do with the advice to admit participating in the robberies and the evidence elicited from Pamela. Since we have concluded that the convictions for the robbery-related offenses must be reversed, to the extent these acts may have contributed to those convictions, the claim is moot.

As to other acts, neither the reason for counsel's actions nor a basis for concluding that a more favorable result would have been achieved had he undertaken the additional steps suggested by Gay is apparent on the record. To the extent that the record affords a basis on which to assess counsel's performance, the record suggests that there may have been a tactical reason for the manner in which counsel cross-examined Pamela. Faced with the

testimony of several eyewitnesses who had identified his client as the person who shot Officer Verna four times as the officer lay on the ground, but whose pretrial identifications had been conflicting, counsel apparently considered Pamela's testimony crucial. He therefore sought to impeach her by cross-examination designed to establish that she was biased, expected to receive substantial benefits for her testimony, and lied when she implicated Gay in order to protect her husband. If counsel could persuade the jury to disregard her testimony, his argument that the remaining evidence did not establish Gay's guilt of the murder beyond a reasonable doubt would have more force.

Because the record is inadequate to enable us to state that Gay's counsel had no tactical reason for the manner in which this aspect of the defense was conducted, the judgment must be affirmed.

B. *Penalty Phase.*

For this claim Gay also relies on counsel's failure to renew his objection to evidence of threats when Deputy Koch testified and counsel's admission that Gay had committed the acts introduced in aggravation.

As we have observed above, the evidence of Gay's threats to Deputy Koch was insignificant in relation to the evidence of far more serious conduct which included evidence of actual, not simply threatened, criminal conduct in jail. Admission of that evidence was not prejudicial. And, while counsel did concede the numerous aggravating factors, his argument confirms that he had a proper tactical reason for doing so. The most serious offenses had been proven at the guilt phase of the trial, and the court had admitted Gay's statement in which he acknowledged participation in many of the robbery-related offenses. There is no probability that the result would have been different had evidence of these threats been excluded.

The remaining evidence was unrebutted. Faced with those circumstances, an attorney's decision to concede the commission of the acts constituting aggravating factors and to argue to the jury that notwithstanding his past the defendant deserves to live is not deficient performance. (*People* v. *Wade* (1988) 44 Cal.3d 975, 988 [244 Cal.Rptr. 905, 750 P.2d 794].)

It is possible that the jury would not have considered the robbery-related offenses with which he was charged as aggravating factors if Gay's statement admitting complicity in those offenses had not been admitted. While the victims' testimony regarding the brutal nature of the robberies was much more graphic than the brief statement, the statement was the strongest

evidence that Gay was the second participant in the robberies. Most of the victims were unable to identify him.

Nonetheless, assuming, arguendo, that the statement was obtained and admitted as a result of incompetence on the part of Gay's attorney, the remaining aggravating evidence was such that it is not reasonably probable that the outcome would have been different had the jury disregarded the robbery evidence. The circumstances of the murder, a cold-blooded, premeditated execution of a police officer for the purpose of avoiding arrest and return to custody, was undoubtedly the most influential aggravating factor. The murder and the circumstances of its commission, considered with the evidence of Gay's assault on his former girlfriend, his commission of arson which seriously injured another former girlfriend, and his attempt to burn another jail inmate, reflected the culmination of a continuing and escalating pattern of life-threatening violent conduct by Gay. We are satisfied that the penalty verdict would not have differed had the jury disregarded the robbery evidence.

## VIII.

### DISPOSITION

The judgment of conviction of defendant Kenneth Earl Gay is reversed as to counts I, II, III, IV, V, VI, VII, VIII, IX, XII, XIII, XIV, and XVI. That judgment, including the sentence of death, is affirmed in all other respects.

The judgment of conviction and sentence of death of defendant Raynard Paul Cummings is affirmed in its entirety.

Lucas, C. J., Panelli, J., Kennard, J., Woods (A. M.), J.,* and Peterson, J.,† concurred.

**MOSK, J.**—I dissent.

In concluding that the judgment against each of the defendants must be reversed in its entirety, I do not ignore the strong evidence adduced at trial bearing on both guilt and penalty. But the record requires reversal in spite of such evidence.

As to defendant Cummings, there was *Wheeler* error in the prosecutor's peremptory challenge to Black prospective juror Leon Passmore on grounds

---

*Presiding Justice, Court of Appeal, Second Appellate District, Division Four, assigned by the Chairperson of the Judicial Council.

†Presiding Justice, Court of Appeal, First Appellate District, Division Five, assigned by the Chairperson of the Judicial Council.

of presumed group bias. (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].) I recognize that the prosecutor attempted to proffer "neutral" reasons for his strike. The attempt failed. In part, the reasons did not match the facts; in other part, they were little more than pretexts.

As to defendant Gay, the error was not in what the prosecutor did but in what trial counsel did not do. The failings of Gay's counsel were "pervasive and serious," and "resulted in a breakdown of the adversarial process at trial; that breakdown establishes a violation of defendant's federal and state constitutional right to the effective assistance of counsel; and that violation mandates reversal of the judgment even in the absence of a showing of specific prejudice." (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 84 [5 Cal.Rptr.2d 495, 825 P.2d 388] (dis. opn. of Mosk, J.).)

For these reasons, I would reverse the judgments.

Appellants' petitions for a rehearing were denied June 23, 1993, and the opinion was modified to read as printed above. Arabian, J., and George, J., did not participate therein. Mosk, J., was of the opinion that the petitions should be granted.